Jess G. BACHNER, d/b/a Fairbanks Aircraft Service, Appellant,

v.

Al PEARSON, Tom Martin, Leon Riley, and Stanislaw Poborski, Appellees.

Al PEARSON, Leon Riley and Stanislaw Poborski, Appellants,

v.

Jess G. BACHNER, d/b/a Fairbanks Aircraft Service, Appellee.

Nos. 1043, 1081.

Supreme Court of Alaska.

Dec. 31, 1970.

Charles E. Cole, Fairbanks, for Jess G. Bachner.

Robert A. Parrish, Fairbanks, and James R. Blair, Fairbanks, of counsel, for Al Pearson and others.

Before BONEY, C. J., DIMOND and RABINOWITZ, JJ., and LEWIS and STEWART, Superior Court Judges.

## OPINION

BONEY, Chief Justice.

On November 15, 1962, a Piper Comanche aircraft crashed near Fairbanks, Alaska; the pilot of the aircraft, Alfred Pearson, and three passengers, Stanislaw Poborski, Leon Riley, and Tom Martin, were seriously injured and subsequently brought an action against Jess Bachner, d/b/a Fairbanks Aircraft Service, to recover damages for injuries sustained in the mishap. In their amended complaint, Pearson, Poborski, Riley and Martin alleged the crashed plane had been leased from Bachner by Pearson. It was also charged that

> [D]ue to the negligence and gross negligence of the defendant and/or his breach of express and implied warranties to the plaintiffs upon which warranties plaintiffs and each of them relied, plaintiff, Al Pearson, became asphyxiated by the escape of carbon monoxide from the

exhaust and heat exchanger system into the cabin of the airplane, thereby causing the airplane to crash and result in injuries to plaintiffs hereinafter alleged.

An extensive review of the events following the filing of the complaint is unnecessary here since this court has already had occasion to pass upon one aspect of the present case. Bachner v. Pearson, 432 P.2d 525 (Alaska 1967). It will be sufficient to note that on April 25, 1967, the superior court, Fourth Judicial District, Fairbanks, invoked pretrial discovery sanctions against Bachner, ordering:

> That all facts relating to the muffler and exhaust system of Piper Comanche aircraft PA 24250, Ser. No. 24–1809, shall be and the same are taken as established for the purposes of this action in accordance with the claims of the plaintiffs.

Bachner petitioned for review of the order entered against him; in Bachner v. Pearson, *supra,* this court affirmed the action of the superior court as a proper exercise of that court's power under Civil Rule 37(b) (2) [a].[1]

Following our ruling on review, the case was eventually set for trial commencing June 17, 1968. Prior to that date, plaintiffs, acting on the strength of the order establishing facts, filed a motion for summary judgment. Argument was heard and the plaintiffs' motion was denied; however, the court did pass upon the extent to which its order of April 25, 1967, would affect the trial, holding that the defendant's negligence was established and that

---

1. Alaska R.Civ.P. 37(b) (2) provides in relevant part:

> If a party or an officer or managing agent of a party refuses to obey an order made under subdivision (a) of this rule requiring him to answer designated questions, or an order made under Rule 34 to produce any document or other thing for inspection, copying or photographing or to permit it to be done, or to permit entry upon land or other property, or an order made under Rule 35 requiring him to submit to a physical or mental exam-

ination, the court may make such orders in regard to the refusal as are just, and among others the following:

> [a] An order that the matters regarding which the questions were asked, or the character description of the thing or land, or the contents of the paper, or the physical or mental condition of the party, or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order.

such negligence was the cause of the accident. Despite strenuous argument by the plaintiffs' counsel, the court ruled that the plaintiffs would be required to produce further evidence in order to establish their claim under the warranty theory.[2] The issues of negligence and causation having thus been determined, the case proceeded to trial on the defendant's claims of contributory negligence and joint venture, on the plaintiffs' claim of gross negligence, and on the issue of damages.

At the close of the evidence at the trial, the defendant conceded that he had failed to establish the defense of joint venture. The court then ruled that the evidence of contributory negligence was insufficient to allow the issue to go to the jury. This ruling effectively resolved the liability of the defendant, leaving only the issue of damages to be submitted to the jury.[3] On July 23, 1968, the jury returned verdicts making substantial awards to each of the plaintiffs. Judgment was entered on the verdicts in favor of the plaintiffs on September 9, 1968. From this judgment both the plaintiffs and the defendant have appealed, assigning numerous errors to the proceedings below and urging necessity for a new trial. For the sake of convenience we will continue to refer to the parties as plaintiffs and defendant in accordance with their positions below. Our attention will first be turned to the appeal of the defendant, Bachner.

The defendant contends first that the superior court committed error in ruling that its sanction order of April 25, 1967, was conclusive of the issues of negligence and causation; similarly, it is contended it was error to send the case to trial with only the affirmative defenses and the damages at issue. The core of the defendant's argument is the assertion that the court's ruling, made just before the beginning of the trial,[4] vastly enlarged the scope of its previous sanction order and exceeded permissible limits. The defendant is precluded by our previous holding in Bachner v. Pearson, *supra,* from questioning the propriety of the original sanction imposed under Civil Rule 37(b) (2) [a].[5] The problem, then, is to decide what facts were established by the sanction order of April 25, 1967, and to determine whether those facts would be dispositive of all issues besides damages and the defendant's affirmative defenses.

█ It must be noted initially that the order of April 25, 1967, which established all facts relating to the defective condition

2. The court passed upon the meaning of the order of April 25, 1967, in the following language:

The court is ruling that the extent of the sanction imposed relating to the muffler was limited to a finding of negligence for the plaintiffs and against the defendant, and that the said negligence was a proximate cause of the injuries of the plaintiff. The question of liability in the Motion for Summary Judgment is denied. If the plaintiffs desire to pursue questions of gross negligence and/or express or implied warranties, they will have to produce evidence to support these allegations. By allowing the plaintiff—the plaintiffs to proceed in these matters, this Court is not expressing any ruling as it relates to the law of Alaska on warranties. Plaintiffs' proof of express or implied warranties need not include the proof of the defective muffler as such shall be deemed proven pursuant to prior order of this Court.

3. In response to a request by the plaintiffs for an instruction on the warranty theory, the court stated that in light of its conclusions on negligence the warranty theory was unnecessary.

4. The ruling of the superior court to which the defendant objects has been cited *supra* n. 2.

5. Patrick v. Sedwick, 413 P.2d 169, 173–174 (Alaska 1966). *See also* Watts v. Seward School Board, 421 P.2d 586, 618 (Alaska 1967) (Rabinowitz J., concurring in part and dissenting in part). Although our previous rulings dealing with the "law of the case" doctrine can be construed to allow this court to reconsider an earlier decision in the same case in certain exceptional circumstances, we do not think that such unusual circumstances exist here. Consequently, we consider ourselves bound by our previous determination in Bachner v. Pearson, 432 P.2d 525 (Alaska 1967).

of the aircraft's muffler and exhaust in accordance with the plaintiffs' claims, was worded broadly and contained no reference to the specific facts to be established. Under these circumstances, the scope of the order could most reasonably be determined by viewing the totality of the factual record in light of the policies underlying the pretrial discovery sanctions provided for in Civil Rule 37.

Alaska Civil Rule 37, under which the trial court's sanction was originally entered, is substantially identical to Rule 37 of the Federal Rules of Civil Procedure; in fact, the entire mechanism for pretrial discovery provided for in Alaska's Rules of Civil Procedure has been taken from the system established in the Federal Rules of Civil Procedure.[6] The importance of a thorough and effective system of pretrial discovery in the resolution of civil matters cannot be overemphasized. The following comment, directed at the crucial role played by discovery in the federal system of civil procedure, is applicable with equal force to the part played by discovery in Alaska:

> In the theory of the federal rule-makers, discovery, with all its forms, is the make-or-break device of the whole system, for pleadings are required to be only generally informative, and clarifying motions are neither encouraged nor efficacious. Unless the discovery rules function sufficiently well, issues will often come to trial or pretrial sprawling and unformed; and many litigants will reach the courtroom ill-prepared.[7]

Within the framework of the vital discovery mechanism, Rule 37 has been established to provide courts with an effective and flexible means of dealing with evasion of pretrial discovery procedures.[8] It is apparent, thus, that to unduly restrict a trial court's power to impose the sanctions provided for in Civil Rule 37 would only work to defeat the purposes of that rule, and might ultimately threaten to render unworkable our system of discovery.

With the exception of our previous decision in Bachner v. Pearson, *supra*, there are no Alaska cases ruling on the extent to which a court may establish facts pursuant to Civil Rule 37(b) (2) [a]. However, federal decisions construing Federal Rules of Civil Procedure 37 (b) (2) [i] would support the conclusion that the court's power to punish evasion of discovery orders by establishing facts in favor of a party is a broad one. Moreover, these cases have shown that when facts established pursuant to Rule 37(b) (2) [i] are dispositive of an issue, summary judgment may be granted to the opposing party. *See* McMullen v. Travelers' Insurance Co., 278 F.2d 834 (9th Cir. 1960); Reynolds v. United States, 192 F.2d 987 (3rd Cir. 1951). Yet the power of the court to punish a litigant by ruling in favor of the opposing party is not without limit. Any such attempt at punishment must remain within the confines of due process of law. In Hovey v. Elliott, 167 U.S. 409, 413–414, 17 S.Ct. 841, 843, 42 L. Ed. 215, 220 (1897). The United States Supreme Court in an opinion written by Mr. Justice White held:

> The fundamental conception of a court of justice is condemnation only after hearing. To say that courts have inherent power to deny all right to defend an action, and to render decrees without any hearing whatever, is, in the very nature of things, to convert the court exercising such an authority into an instrument of wrong and oppression, and hence to strip it of that attribute of justice upon which the exercise of judicial power necessarily depends.

The Court's ruling in the *Hovey* case was clarified in the subsequent case of Hammond Packing Co. v. Arkansas, 212

---

6. *Compare* Alaska R.Civ.P. 26–37, with Fed.R.Civ.P. 26–37.

7. Rosenberg, Sanctions to Effectuate Pretrial Discovery, 58 Colum.L.Rev. 481 (1958).

8. *Id.* at 482.

U.S. 322, 29 S.Ct. 370, 53 L.Ed. 530 (1909). In *Hammond* the trial court, acting pursuant to statutory provisions, ordered the defendant to furnish a deposition. When the defendant refused, the court struck the defendant's answer and entered judgment in default in favor of the plaintiff. The United States Supreme Court in upholding the action taken by the trial court distinguished the case from Hovey v. Elliott in the following terms:

> *Hovey v. Elliott involved a denial of all right to defend as a mere punishment.* This case presents a failure by the defendant to produce what we must assume was material evidence in its possession, and a resulting striking out of an answer and a default. *The proceeding here taken may therefore find its sanction in the undoubted right of the lawmaking power to create a presumption of fact as to the bad faith and untruth* of an answer to be gotten from the suppression or failure to produce the proof ordered, when such proof concerned the rightful decision of the cause.

212 U.S. at 350–351, 29 S.Ct. at 380, 53 L. Ed. at 545 (emphasis supplied).

■ We find that the boundaries of due process, as charted in the *Hovey* and *Hammond* cases provide an appropriate point of departure in the present case for the determination of the scope and meaning of the lower court's order establishing facts pursuant to Civil Rule 37(b) (2) [a].[9] Accordingly, we hold that the lower court's order of April 25 can most rationally be construed as establishing all those facts which depended for their proof upon the availability of the muffler and exhaust system. We are supported in our view by Professor Moore, who writes:

> Thus when the facts taken as established under Rule 37(b) (2) [i], or the evidence excluded under 37(b) (2) [ii], or the portion of the case dismissed under 37(b) (2) [iii] are elements of the dispute that cannot be determined on the merits without disclosure of the evidence the court has ordered the party to produce, it can be said that the *Hammond* presumption applies. If, on the other hand, the fact taken as established, the evidence excluded, or the issue subject to default or dismissal has no connection with the information the party has neglected to supply, the sanction might be looked upon as mere punishment interdicted under the *Hovey* rule.[10]

Following the approach suggested by the *Hovey* and *Hammond* cases and by Professor Moore, we conclude that in the instant case the trial court's order of April 25, 1967, must be construed to have established the existence of a defect in the exhaust system of the Piper Comanche at the time the aircraft was leased to Pearson; the order must further be construed to have established that the defect in the exhaust system allowed carbon monoxide to enter into the cabin of the aircraft on the date in question, thereby causing the plane to crash.[11] It can be ventured without hesitation that the plaintiffs could not have reasonably

9. The United States Supreme Court has more recently indicated that under the holding of the Hammond case, the dismissal of a case for failure to produce records is not warranted where the failure stems from inability rather than from contumacy; in such a situation, no presumption could be drawn from the failure to produce the required records. *See,* Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958). Because the issue of the defendant's contumacy was decided by the lower court in reaching its decision to apply sanctions under Rule 37(b) (2) [a], and because our decision in Bachner v. Pearson, 432 P.2d 525 (Alaska 1967), affirmed the action of the lower court, we need not face the problem posed by the Rogers case.

10. 4 J. Moore, Lucas and Garfinkel, Moore's Fed.P. ¶ 37.03 [1], at 2841–42 (2d ed. 1969).

11. It should perhaps be noted that in his testimony at trial, the defendant conceded that the crash was caused by a hole in the exhaust system which allowed carbon monoxide to enter the cabin of the airplane.

been expected to prove either the existence of the defect or the causal link between the defect and the crash without an opportunity to inspect the muffler and exhaust systems.

█ The defendant insists that the muffler and exhaust systems of the aircraft have in fact been made available to the plaintiffs since April 1967, and that proper inspections could have been conducted. Yet this argument misses the point. Because the order of April 25, 1967, has already been upheld by this court we are concerned here only with construing that order in light of the situation which existed at the time of its issuance. The order of April 25 was entered against the defendant as a consequence of a long period of dilatory conduct on his part, and not as a prediction that he would not, or could not, subsequently produce the muffler and exhaust systems.

The defendant maintains, further, that even under the construction of the sanction order which we have adopted, the issue of negligence was not concluded and should have been left for trial. This raises the question whether the existence of negligence is itself a fact of the type which can properly be deemed established under Civil Rule 37(b) (2) [a]. The plaintiffs refute the defendant's assertions on this point by arguing that proof of the defendant's negligence could not have been made in the absence of specific knowledge of the type of defect which caused the accident; for this reason, the plaintiffs maintain that the issue of the defendant's negligence must be considered established under the sanction imposed by the court.[12]

The plaintiffs have asserted as an alternative argument that even if the sanction order cannot be construed to establish as fact the negligence of the defendant, a sufficient case would still have been made out under the theory of strict tort liability. Under the holding of Ransom v. Haner, 362 P.2d 282, 285 (Alaska 1961),

an appellee may urge, and the appellate court should consider in defense of a decree or judgment any matter appearing in the record, even if rejected below and even if appellee's argument may involve an attack upon the reasoning of a lower court or an insistence upon matter overlooked or ignored by it. (Footnote omitted.)

The language of Ransom v. Haner makes it manifest that if, under the facts we have held to be established, the plaintiffs would have been entitled to recover damages on a theory of strict liability in tort, without recourse to negligence, the fact that the trial court ruled on a theory of negligence would be immaterial. Thus we will turn our attention to question whether the plaintiffs, having established that the existence of a defect in the exhaust system of the aircraft caused the crash, would be entitled to recovery on a theory of strict liability in tort.

Since the decision of Henningsen v. Bloomfield Motors, Inc., 32 N.J. 358, 161 A.2d 69 (1960), and Greenman v. Yuba Power Prod. Inc., 59 Cal.2d 57, 27 Cal. Rptr. 697, 377 P.2d 897 (1962), the doctrine of strict liability in tort has met with vastly increased acceptance and use in the courts of the United States.[13] Thus, in the past decade the protection afforded to a person injured by a defective product has been tremendously enhanced by consistent expansion of the concept of strict tort liability.[14] In the recent case of Clary v.

12. Our holding on the issue of strict liability in tort makes it unnecessary for us to decide whether the issue of the defendant's negligence was, or could have been, properly deemed established by the sanction imposed pursuant to Civil R. 37 (b) (2) [a].

13. For an excellent survey of the development of strict liability in tort for injuries stemming from defective products, see Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn.L. Rev. 791 (1966); and Prosser, The Attack on the Citadel (Strict Liability to the Consumer), 69 Yale L.J. 1099 (1960).

14. Examples of the expansion of the concept of strict tort liability are abundant. Vandermark v. Ford Motor Co., 61 Cal.

Fifth Avenue Chrysler Center, Inc., 454 P.2d 244 (Alaska 1969), we applied the doctrine of strict tort liability for the first time in this state, holding that a person who sustained injuries caused by a defective product could recover damages from either the manufacturer or the retailer of the product without alleging or proving negligence. In deciding *Clary,* we quoted with approval from Chief Justice Traynor's opinion in *Greenman, supra:*

> A manufacturer is strictly liable in tort when an article he places on the market, knowing that it is to be used without inspection for defects, proves to have a defect that causes injury to a human being.

27 Cal.Rptr. at 700, 377 P.2d at 900.

2d 256, 37 Cal.Rptr. 896, 391 P.2d 168 (1964), extended strict liability to permit a person injured by a defective product to recover from the retailer who sold the product, as well as from the manufacturer. Strict liability was extended to manufacturers of component parts in Alvarez v. Felker Mfg. Co., 230 Cal.App.2d 987, 41 Cal.Rptr. 514 (1964). Recently, several courts have applied strict liability to allow injured bystanders to recover damages. *See* Elmore v. American Motors Corp., 70 Cal.2d 578, 75 Cal.Rptr. 652, 451 P.2d 84 (1969) ; Piercefield v. Remington Arms Co., 375 Mich. 85, 133 N.W.2d 129 (1965) ; Mitchell v. Miller, 26 Conn.Sup. 142, 214 A.2d 694 (1965). Additionally, strict liability has been invoked against a mass builder of homes. Schipper v. Levitt & Sons, Inc., 44 N.J. 70, 207 A.2d 314 (1965). It should finally be noted that in Greco v. Bucciconi Eng'r Co., 283 F.Supp. 978 (W.D. Penn.1967), aff'd 407 F.2d 87 (3d Cir. 1969), a Federal District Court construed Pennsylvania law to allow the plaintiff to recover damages from the manufacturer of equipment despite the plaintiff's failure to prove the existence of a defect. The court in Greco held that the mere occurrence of a malfunction evidences a defect; from this premise, the court reasoned that the manufacturer was in the best position to show the existence or non-existence of a defective condition. Accordingly, the burden was placed on the defendant to prove that the malfunction was not caused by a defect in the equipment. *See* Note, Products Liability and the Problem of Proof, 21 Stan.L.Rev. 1777 (1969).

We have held in the instant case that the sanction order of April 25, 1967, established the following facts: (1) that a defect existed in the exhaust system of the airplane in question; (2) that such defect existed at the date the airplane was leased by the defendant to Alfred Pearson; (3) that the existence of the defect caused the crash in question to occur. Following the standards set forth in *Greenman* and adopted by this court in *Clary,* it is not difficult to see that the plaintiffs are correct in maintaining that the facts which we have held to be established by the April 25, 1967 sanction order would appear sufficient to permit recovery under the strict tort liability theory.[15] The

15. In their arguments at trial and on appeal, the plaintiffs contended that under the facts established by the April 25, 1967 order they were entitled to recover on the theory of implied warranty. The plaintiffs did not refer to strict liability in tort as such. We do not consider the plaintiffs' use of the language of warranty, rather than strict liability, to be significant in this case. Dean Prosser has observed that developments in the law of warranty have led that concept to be merged with the doctrine of strict liability in tort:

> Although the writer was perhaps the first to voice it, the suggestion was sufficiently obvious that all of the trouble lay with the one word 'warranty', which had been from the outset only a rather transparent device to accomplish the desired result of strict liability. No one disputed that the 'warranty' was a matter of strict liability. No one denied that where there was no privity, liability to the consumer could not sound in contract and must be a matter of tort. Why not, then, talk of the strict liability in tort, a thing familiar enough in the law of animals, and abnormally dangerous activities, nuisance, workmen's compensation, libel, misrepresentation, and respondeat superior, and discard the word 'warranty' with all its contract implications?

W. L. Prosser, The Fall of the Citadel (Strict Liability to the Consumer), 50 Minn.L.Rev. 791, 802 (1966).

Other authorities have agreed that there should be no distinction made in products liability cases between recovery under an

sole difficulty which confronts us in applying strict liability to the present case is the fact that the aircraft piloted by Pearson was leased, rather than purchased, from the defendant. However, upon consideration, we are of the view that the distinction between sales and leases is not significant for the purposes of strict liability in tort.

It has long been recognized that the policies governing the law of warranties are not limited to sales transactions.[16] Thus, it has frequently been held that the existence of a bailment instead of a sale would not preclude a plaintiff from recovering under a theory of implied warranty.[17] The draftsmen of the Uniform Commercial Code have similarly recognized that recovery on warranty need not be limited to instances of sale:

> Although this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale, the warranty sections of this article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract. They may arise in oth-

er appropriate circumstances such as in the case of bailments for hire * * * [18]

These authorities furnish a convenient parallel to the problem which we face in the present case. The fact that the doctrine of strict liability in tort has heretofore been applied chiefly in cases involving sales transactions should not in itself be taken as a justification for refusing to expand the doctrine into other areas. We held in *Clary* that strict liability is imposed upon manufacturers and retailers in order to

> insure that the cost [sic, costs] of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.

454 P.2d at 248. We think the reasons for applying the doctrine of strict liability to manufacturers and retailers are equally valid in the context of leases.

We are not alone in concluding that the doctrine of strict liability in tort should be applied to bailors and lessors; courts in both California and New Jersey have come to the same conclusion. *See* Price v. Shell Oil Co., 2 Cal.3d 245, 85 Cal.Rptr. 178, 466 P.2d 722 (1970); Mc-

---

implied warranty theory and recovery under strict liability in tort. *See, for example*, The Restatement of Torts 2d § 402A, comment c (1965) ; 2 L. F. Frumer and M. I. Friedman, Products Liability § 16A [2] (1968).

We have previously held that instructions given to the jury on a theory of implied warranty are insufficient where recovery could also be based on a theory of strict products liability. *See* Clary v. Fifth Avenue Chrysler Center, Inc., 454 P.2d 244, 249 (Alaska 1969). *But see* Justice Rabinowitz' dissent, *Id.* at 251–252. The fact that there might be slight differences between recovery in implied warranty and recovery under a strict tort liability theory is of little moment to the present case. For we hold only that implied warranty and strict products liability are sufficiently similar to require that a complaint worded in terms of the former theory should be deemed to raise a claim under the latter theory.

16. *See* Farnsworth, Implied Warranties of Quality in Non-Sales Cases, 57 Colum.L. Rev. 653, 655–660 (1957).

17. *See, e. g.*, Delaney v. Towmotor Corp., 339 F.2d 4 (2d Cir. 1964) ; and Greeno v. Clark Equipment Co., 237 F.Supp. 427 (N.D.Ind.1965).

18. Uniform Commercial Code § 2–313, Official Comment 2 (1968). A similar observation has been made in 2 Harper & James, The Law of Torts § 28.19, at 1577 (1956) :

> [T]he common law began to develop implied warranties of quality in sales, and such warranties were recognized in the Sales Act. But that development furnishes no reason for withholding protection in other situations where the same considerations obtain. Rather it should point the way by suggestive analogy, to similar results elsewhere. Any other approach misses the woods for the trees. (Citations omitted)

Claflin v. Bayshore Equipment Rental Co., 274 Cal.App.2d 446, 79 Cal.Rptr. 337 (1969); Cintrone v. Hertz Truck Leasing, etc., 45 N.J. 434, 212 A.2d 769 (1965). In short, we are persuaded that the commercial lessor acts much like the retailer and manufacturer in placing products in the stream of commerce. Also, the lessor will in most instances be in a better position than the consumer to prevent the circulation of defective products. Finally, the lessor, like the retailer and the manufacturer, will generally be able to spread damages and insure against the risk of injuries stemming from the use of defective products which he has placed on the market. For these reasons, we hold that the doctrine of strict liability is applicable, when otherwise appropriate, to commercial lease transactions in Alaska.

We must emphasize that our holding extending the doctrine of strict liability to lessor-lessee transactions is qualified by the same limitations developed in cases imposing strict liability on retailers and manufacturers. Just as strict liability has not been imposed in cases of single transaction, non-commercial sales, no such liability will result where the lease in question is an isolated occurrence outside the usual course of the lessor's business.[19] In the instant case, however, there can be no doubt that the lease option entered into by the defendant and Alfred Pearson was of a sufficiently commercial nature to warrant application of the doctrine.

The record reveals that the defendant operated a dealership for Piper Aircrafts, selling all models of Piper airplanes. In addition to the sale of aircraft, the defendant was engaged in the business of aircraft maintenance. The agreement entered into by the parties was a printed form on which the defendant, both by his name and by the name of his business, was designated as lessor. Blanks were left in the printed form for the lessee's name, the specifications of the aircraft to be leased, and other relevant terms to be either written or typed in. Furthermore, under the terms of the lease, the defendant was to furnish all inspections and major maintenance to the aircraft. Thus, the evidence disclosed by the record is sufficient to establish that the lease in this case was an essentially commercial transaction falling within the scope of the defendant's usual course of business. We therefore conclude that on the basis of the facts established by the superior court's sanction order of April 25, 1967 (and excluding for the moment the existence of any affirmative defense), the plaintiffs would have been entitled to recover from the defendant on the theory of strict tort liability all damages stemming from the crash of the airplane.

Having decided that strict liability in tort is applicable to the circumstances of the present case, we must next consider whether, and to what extent, contributory negligence is effective as a defense to strict tort liability. If, on the one hand, contributory negligence is not a defense to strict liability, then we would be constrained to hold that the trial court, acting on the basis of facts established by the April 27, 1967 order, should have allowed the case to go to trial on the issue of damages alone. While, on the other hand, if contributory negligence is a defense, the court correctly permitted the issue of the plaintiffs' contributory negligence to be tried.

The observation has frequently been made that cases are divided on the question of whether the contributory negligence of a plaintiff constitutes a defense to strict tort liability. In some cases it has been held that contributory negligence is not a defense to strict tort liability simply because the doctrine of strict liability is not founded on negligence. *See, e. g.,* Barth v. B.

19. *See* Price v. Shell Oil Co., 2 Cal.3d 245, 85 Cal.Rptr. 178, 466 P.2d 722, 727 (1970); W. E. Johnson Equipment Co. v. United Airlines, Inc., 238 So.2d 98 (Fla.1970); Conroy v. 10 Brewster Avenue Corp., 97 N.J.Super. 75, 234 A.2d 415 (1967). *See also* 2 Restatement of Torts 2d § 402A, comment f (1965).

F. Goodrich Tire Co., 265 Cal.App.2d 228, 71 Cal.Rptr. 306 (1968). Other cases, for no better reason than that strict liability is a part of the law of the torts, have held that contributory negligence is a defense to strict liability. *See e. g.,* O. S. Stapley Co. v. Miller, 6 Ariz.App. 122, 430 P.2d 701 (1967). Dean Prosser has attempted to resolve the divergence of opinion in the following manner:

> The conflict is, however, more apparent than real. If the cases are examined, it readily appears that those which refuse to allow the defense have been cases in which the plaintiff negligently failed to discover the defect in the product or to guard against the possibility of its existence. * * * Those which have permitted the defense all have been cases in which the plaintiff has discovered the defect and the danger, and has proceeded nevertheless to make use of the product. They represent the form of contributory negligence which consists of deliberately and unreasonably proceeding to encounter a known danger and overlaps assumption of the risk.[20]

The approach suggested by Prosser has been endorsed in Section 402A of the Restatement of Torts 2d.[21] There now appears to be virtual agreement among the authorities that a defendant should be permitted to prove as a defense to strict liability that the plaintiff discovered the defect, realized the danger which it posed, but nonetheless willfully and unreasonably proceeded on the course of conduct leading to his injury.

Yet the solution offered by Dean Prosser's approach may not be wholly adequate.

For between the area of negligently failing to discover the existence of a defect and that of willingly encountering a known risk, lies a middle ground, where the plaintiff's negligent conduct or misuse of the product concurs with the existence of a defect in causing an injury to occur.[22] The determination of whether contributory negligence will constitute a defense in such cases must necessarily be influenced by the same policies which initially required the application of strict liability to the defendant.

While there is disagreement among the commentators as to some of the fundamental concepts underlying the imposition of strict liability,[23] it would probably be agreed that the focus of attention in strict liability cases is not on the conduct of the defendant, but rather on the existence of the defective product which causes injuries. Liability is attached, as a matter of policy, on the basis of the existence of a defect rather than on the basis of the defendant's negligent conduct. The policies which call for the application of strict liability have been discussed above and need not be reviewed here. It will be sufficient to note that, in our view, if a product is defective, if the plaintiff is unaware of that defect, and if that defect is the proximate cause of the plaintiff's injury, then the fact the plaintiff's negligent conduct may have concurred with the defect to cause his injury should have no bearing on the validity of the initial policies calling for the application of strict liability. It is consequently our opinion that contributory negligence, as a defense to strict liability in tort, should be limited to those cases

20. W. L. Prosser, The Law of Torts, § 95 at 656–657 (3d ed. 1964).

21. 2 Restatement of Torts 2d § 402A, comment n (1965).

22. This point is discussed at length in Annot., 13 A.L.R.3d 1057, 1100–03 (1967).
 Several cases have dealt explicitly with the problem and have concluded that contributory negligence in such cases would constitute a defense. *See, e. g.,* Dippel v. Sciano, 37 Wis.2d 443, 155 N.W.2d 55

(1967); McDevitt v. Standard Oil Co. of Texas, 391 F.2d 364 (5th Cir. 1968); Maiorino v. Weco Prod. Co., 45 N.J. 570, 214 A.2d 18 (1965). *But see* Pizza Inn, Inc. v. Tiffany, 454 S.W.2d 420 (Tex.Civ.App.1970).

23. *Compare,* for instance, R. E. Keeton, Conditional Fault in the Law of Torts, 72 Harv.L.Rev. 401 (1959), *with* Calebrisi, Some Thoughts on Risk Distribution and the Law of Torts, 70 Yale L.J. 499 (1961).

where the plaintiff voluntarily and unreasonably encounters a known risk.[24] It is our conclusion, then, in ruling on the first point raised on appeal by the defendant, that the trial court was correct in allowing the parties to present evidence on the issues of the defendant's affirmative defenses and the plaintiffs' damages. As we have already mentioned, the fact that the trial court ruled for reasons other than those which we have expressed is immaterial.

■ The defendant next alleges that the trial court erred in striking the defense of contributing negligence at the close of his case, thereby precluding the issue from the jury's consideration. A perusal of the record indicates that ample evidence was produced to show that Pearson had been negligent in failing to discover the defective condition of the exhaust system and in failing to realize that carbon monoxide was entering the cabin of the aircraft. There is also some testimony which tends to show that Pearson's negligent starting of the plane in cold weather might have speeded the deterioration of the muffler and exhaust systems. However, there is absolutely nothing in the record from which a jury could conclude that Pearson actually knew of the defective condition of the muffler, yet proceeded to fly the plane. Our holding on the subject of strict liability is therefore conclusive of this issue. Under our holding, the defendant's only recourse in attempting to establish the plaintiff's contributory

negligence as a defense to strict liability would have been to prove that Pearson knew of the defect in the exhaust system. The defendant was properly allowed the opportunity to prove contributory negligence, but the evidence which was presented at trial was not sufficient to sustain a finding that Pearson actually knew of the defect in the exhaust system. For this reason we hold that the trial court acted correctly in striking the issue of contributory negligence at the conclusion of the defendant's case.

The defendant further assigns as error the trial court's failure to strike the plaintiffs' claim of gross negligence. At the close of the plaintiffs' case the defendant made a motion pursuant to Civil Rule 41(b) to dismiss the plaintiffs' claim of gross negligence.[25] This motion was denied. However, it appears that the plaintiffs' claim of gross negligence was raised only as a shield against the defendant's assertion of contributory negligence. When the trial court dismissed the defendant's claim of contributory negligence, the issue of gross negligence became superfluous and was consequently not submitted to the jury. Because we have previously upheld the trial court's dismissal of the issue of contributory negligence, we do not need to consider whether the court's refusal to dismiss the claim of gross negligence at the end of the plaintiffs' case was erroneous.

■ The defendant asserts, finally, that the trial court erred in refusing to al-

24. In Leavitt v. Gillaspie, 443 P.2d 61, 67–69 (Alaska 1968), we abandoned the doctrine of assumption of the risk insofar as that doctrine was not already included in existing concepts of negligence and contributory negligence. Although the contributory negligence standard we have adopted today requires a voluntary assumption of a known risk, it is ultimately distinguishable from the doctrine of assumption of the risk abandoned in the Leavitt case. For here, in order to preclude the plaintiff from recovering in strict tort liability it must be shown that he did more than merely assume a known risk: it must be shown that he assumed

it unreasonably. Consequently, the defense adopted in this case is properly classified as contributory negligence rather than as assumption of the risk.

25. The pertinent portion of Alaska R.Civ. P. 41(b), provides:

After the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.

low him to introduce evidence as to the trade meanings of certain terms used in the lease. Also assigned as error is the court's refusal to permit the introduction of federal aviation agency regulations relating to the responsibility of pilots for determining whether an aircraft is airworthy. The proffered evidence might be construed as having been relevant to prove that the defendant was not negligent; similarly, the evidence might have been relevant to show that Pearson was contributorily negligent in failing to discover the defective condition of the aircraft's exhaust system. But the issues of the defendant's negligence and the contributory negligence of Pearson in failing to discover the defect are in themselves irrelevant under our holding on the issue of strict liability. The defendant could not have escaped strict tort liability by showing that he did not act negligently; neither could he have defended against liability by asserting that Pearson negligently failed to discover the defective exhaust system. It is our conclusion that the proffered evidence would have had no possible bearing om the question whether Pearson actually discovered the flaw in the exhaust. The trial court's refusal to hear this evidence was therefore justified.

## PEARSON V. BACHNER

We have now finished with the contentions raised on appeal by the defendant and must next turn to the appeal brought by the plaintiffs.[26] We will rule first upon the plaintiffs' contention that the amount of damages awarded by the trial court was inadequate and contrary to the evidence produced at trial. The verdicts rendered by the jury awarded $30,000 to Alfred Pearson, $35,000 to Stanislaw Poborski, and $22,500 to Leon Riley. Although the plaintiffs concede that these are substantial amounts, they insist that the damages awarded are not in proportion with the injuries which they proved at trial.

The argument in the plaintiffs' brief on appeal sets forth the amounts awarded by the jury and then summarizes the injuries and other damages sustained by each of the plaintiffs. Having come this far in their presentation, the plaintiffs simply assert—without citing any authority or making any further argument—that the amounts awarded were "insufficient, inadequate and contrary to the evidence produced at trial." Such a cursory restatement of an argument on appeal does not prompt us to reverse the lower tribunal. A review of the record has failed to convince us that the damages awarded at trial were, as a matter of law, inadequate. Accordingly, we hold that the plaintiffs have not made a sufficient showing that the amounts awarded by the jury were insufficient to warrant reversal.

In their next point, the plaintiffs seek to question the method employed in selecting the jury panel for the trial. Before dealing with the specifics of this argument, it would perhaps be helpful to review the procedures which were in effect at the time of the plaintiffs' trial. Prior to trial, counsel for both the plaintiffs and the defendant questioned Olga T. Steger, Marian Dellage and Anna Creasy, chief clerk, chief deputy clerk, and deputy clerk respectively, of the superior court, Fourth Judicial District. The testimony of the three clerks revealed the following:

A hopper containing the names of voters from the last general election was kept in the superior court building in Fairbanks. By order of the presiding judge of the Fourth Judicial District, the names held in the hopper were restricted to voters who resided within a radius of 15 miles from Fairbanks. When the list of people available to serve as jurors would become depleted, usually once a year, about 1,000 names were selected at random from the hopper. Questionnaires were then mailed to each person whose name had been

---

26. It should be noted that apparently Tom Martin has not joined the other plaintiffs in bringing this appeal.

drawn, requesting pertinent data. When the questionnaires were returned, they were read over to see whether the persons answering were eligible. Any decisions involving discretion were made by the presiding judge.

All questionnaires thus returned were placed in a file box where they were stored until needed. When a completely new group of jurors was required, names were selected at random from the box containing the questionnaires. Groups so selected, usually numbering about 40 jurors, were referred to as venires and were summoned by registered mail to appear in order to be formally qualified and to be placed on active status. It was the policy of the clerk's office to keep between 80 and 100 jurors on active status. An individual called to serve was eligible to serve for approximately three months. Between the times when jury panels became so depleted that an entire new venire was required, individual names were added from the file box of questionnaires as they were needed.

As we have mentioned above, jurors were initially summoned by mail. However, after their first appearance and after being qualified, they were no longer summoned by mail, but were instead called by telephone. Usually, the day before a jury trial was scheduled the presiding judge would inform the clerk's office and a panel of jurors would then be called for the next day. The reason for the use of telephone rather than mail to summon individuals for jury duty was apparently that the day to day changes in the court calendar would have made it difficult and inconvenient to summon people several days in advance, as would have been required by the use of the mails.

Testimony of the three witnesses also showed that if a person stated that he did not have a telephone, efforts were made to obtain a phone number of a neighbor, or any other number through which the person could be reached. Similarly, if a person could not be reached at his home during the day, his telephone number at work would be taken; if the person was called at work and was unavailable or out on the job, a message was left, and additional attempts were made to contact him. Although most calls were placed during business hours, occasionally one of the members of the clerk's office would remain after-hours to make calls. It is in this fashion, then, the jurors were selected to serve at the time of the trial in question.

■ The plaintiffs argue that this method of selection denied them of a trial by a fair and impartial jury in several respects. We will first dispense with the argument that the 15 mile limit ordered by the presiding judge was improper. We have previously upheld the setting of such a limit in Crawford v. State, 408 P.2d 1002 (Alaska 1965). The plaintiffs here have made no showing whatsoever regarding the effect of the 15 mile limit on the exclusion of social, racial or economic groups from the jury panels within the Fourth Judicial District. Instead, the plaintiffs have cited 28 U.S.C.A. § 1863(b) (3) [1968], a provision setting out criteria for Federal District Courts to follow in the selection of jury panels. It is contended that under this provision the 15 mile limit would not have been permissible, and that this court should therefore hold improper the procedure used.

However, the criteria for the selection of juries in the statute cited are applicable only to federal courts. Courts of this state are under no obligation to follow the specific procedures employed in the federal courts. Rather, we are free, within the boundaries of the United States and Alaska Constitutions, and within the limits set by our Legislature, to develop a system and procedure of our own. This was in fact done when the presiding judge of the Fourth Judicial District ordered the establishment of the 15 mile limit. Since an identical limit has previously been upheld by this court in the *Crawford* case, and because the plaintiffs have advanced no additional basis upon which we could reverse our view, we adhere to our holding in

*Crawford* and find that no error was committed in allowing the case to be tried with a jury panel selected from within the 15 mile limit.

 The plaintiffs also challenge the use of telephones in summoning the members of their jury panel. It is suggested that such a procedure was violative of the plaintiffs' rights under both the due process[27] and the equal protection[28] clauses. The plaintiffs' argument from equal protection may be readily dispensed with. While it is well established that an individual's right to equal protection of the law will be violated when that individual is subjected to trial by a jury from which members of a class to which he belongs have been systematically excluded,[29] the plaintiffs have made no allegation that they were members of any class excluded from their jury panel; nor has there been any showing made that the plaintiffs could have in any way been prejudiced by the exclusion of any class from the panel. For these reasons, we hold that the plaintiffs' right to the equal protection of law under the United States and Alaska Constitutions has not been violated.[30]

The plaintiffs' argument that they have been denied due process of law presents a more difficult question. In Thiel v. Southern Pac. Co., 328 U.S. 217, 220, 66 S.Ct. 984, 985–986, 90 L.Ed. 1181, 1184–1185 (1946), the United States Supreme Court stated:

The American tradition of trial by jury, considered in connection with ei-ther criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. * * * This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would not be possible. *But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups.* Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury. (Emphasis added.)

It is clear moreover that under a due process argument, the plaintiffs are not required to prove that they were specifically prejudiced.[31]

We have previously had occasion to comment upon the meaning of the term "due process of law". In Green v. State, 462 P.2d 994, 996–997 (Alaska 1969), we stated:

The term 'due process of law' is not susceptible of precise definition or reduction to a mathematical formula. But in the course of judicial decisions it has

27. U.S.Const. amend. XIV § 1 provides: * * * nor shall any State deprive any person of life, liberty, or property, without due process of law * * *.
Alaska Const. art. I, § 7 provides: No person shall be deprived of life, liberty, or property, without due process of law.

28. U.S.Const. amend. XIV § 1 provides: * * * nor shall any State * * * deny to any person within its jurisdiction the equal protection of the laws.
Alaska Const. art. I, § 1 provides: This constitution is dedicated to the principle that * * * all persons are equal and entitled to equal rights,

opportunities, and protection under the law * * *

29. *See, e. g..* Eubanks v. Louisiana, 356 U.S. 584, 585–589, 78 S.Ct. 970, 2 L.Ed. 2d 991, 993–995 (1958).

30. *See* our recent holding in Green v. State, 462 P.2d 994, 996 (Alaska 1969); *see also* Crawford v. State, 408 P.2d 1002, 1007 (Alaska 1965).

31. Ballard v. United States, 329 U.S. 187, 193, 67 S.Ct. 261, 91 L.Ed. 181, 185 (1946); Thiel v. Southern Pac. Co., 328 U.S. 217, 225, 66 S.Ct. 984, 90 L.Ed. 1181, 1187 (1946).

come to express a basic concept of justice under law, such as 'our traditional conception of fair play and substantial justice' the 'protection of the individual from arbitrary action', 'fundamental principles of liberty and justice', whether there has been a '[denial of] fundamental fairness, shocking to the universal sense of justice', 'that whole community sense of "decency and fairness" that has been woven by common experience into the fabric of acceptable conduct', and a 'respect for those personal immunities which * * * are "so rooted in the traditions and conscience of our people as to be ranked as fundamental", * * * or are "implicit in the concept of ordered liberty."' (Citations omitted.)

In *Green,* we stated additionally:

If it appeared that the jury selected for petitioners' trial would not be 'impartial' in the constitutional sense because not truly representative of the community where petitioners are to be tried, then petitioners could make a valid argument that they were not accorded due process of law.

462 P.2d at 997.

We simply do not think that the plaintiffs in the instant case have shown the systematic exclusion of any group from their jury panel. The basis here for claiming the use of the telephone in summoning jurors was violative of due process of law is the plaintiffs' assertion that such a practice systematically excluded an economic group comprised of those individuals who could not afford telephones. No effort has been made to show the existence of any distinct group, but it has merely been submitted that "[i]t must be recognized that there is a certain class of poverty level individuals who cannot afford telephones." We are asked to deduce that use of the telephone to summon jurors systematically excludes this class.

However, the plaintiffs' claim falls short of an adequate showing that due process of law has been denied. Although we are asked to assume the existence of a class of people too poor to afford telephones, there has been no showing made as to the extent or cohesiveness of such a group. We have no way to gauge at what stratum of society the group in question might begin. In short, we are being asked to speculate on the very identity of the group allegedly excluded from the plaintiffs' jury panel. Another shortcoming inherent in the lack of any specific showing is that we have no way of knowing how many people can, in fact, afford to have telephones but for various reasons choose not to have them. Thus, even if it could be assumed that poverty level groups would not be able to afford as many telephones, we would have no way of knowing to what extent this factor is offset at other economic levels.

By far the most significant factor in leading us to the conclusion that there has been no showing of a deprivation of due process is the testimony in the record concerning the actual method by which jurors were summoned. It must first be observed that jurors were initially summoned by mail. Although individuals who appeared and qualified to serve would subsequently be called by telephone, it is crucial to note that jurors without telephones of their own were by no means excluded. On the contrary, testimony in the records discloses that every effort was made to obtain some telephone number through which such individuals could be reached, or at least a number where a message could be left. Even in the occasional case where an individual could not be reached through any number, exclusion was not automatic. It was the testimony of the deputy clerk of the superior court that individuals who could not be reached by telephone would frequently exercise their own initiative and check with the clerk's office to see whether they would be called for duty. On the basis of this testimony, it would be difficult indeed for us to conclude that there was, at the time of the plaintiffs' trial, a systematic exclusion of any single group from the jury panel. We find no error in

the procedure used to obtain the jury panel for the plaintiffs' trial.

■ There remains to be considered an assortment of lesser issues raised on appeal by the plaintiffs. The plaintiffs assign error to the trial court's ruling which precluded their counsel from asking a prospective juror, on voir dire, whether the juror thought that the system of allowing separate judgments to each plaintiff was fair. The record shows that the following exchange occurred:

> COUNSEL * * * Would you have any prejudice against granting a separate judgment to each one of them [the plaintiffs] based upon each of their individual evidence?
>
> MISS COLLIER No.
>
> COUNSEL Do you think that is a fair way to go about it?

At this point in the proceedings defense counsel interceded with an objection, which was sustained by the court. The plaintiffs have claimed that since one of the purposes of voir dire is to allow a party to form a basis upon which to exercise a peremptory challenge, the court committed error in refusing to allow the question to be answered.

While it is well established that one of the purposes of voir dire is to obtain information which will allow a more enlightened exercise of the peremptory challenge,[32] it is equally well settled that a trial court will have broad discretion on the scope of questioning on voir dire and that the court's discretion will not be disturbed on appeal in the absence of a clear showing of abuse.[33] In the situation of the present case, where the plaintiffs' counsel was permitted to ask whether the prospective juror would be prejudiced against granting separate judgments to the plaintiffs, and where the juror replied that she would not, we fail to see abuse on the

part of the trial court in limiting questioning at that point.

The plaintiffs contend that the trial court committed error in refusing to allow the introduction into evidence of certain admissions made by the defense counsel. Prior to trial, defense counsel made a statement pertaining to the defective condition of the exhaust system of the Piper Comanche and to the presence of carbon monoxide in the blood of the victims of the crash. The plaintiffs argue that these statements were tantamount to admissions by the defendant on the issues of the existence of a defect and causation, and should thus have been admitted into evidence. Apparently overlooked in this argument is the fact that the trial court ruled that these very issues were concluded in favor of the plaintiffs by virtue of the sanction order of April 25, 1967. It is therefore plain that, these issues having already been concluded, introduction of the statements was unnecessary.

■ We consider next the plaintiffs' related claim that the trial court should have instructed the jury at the commencement of trial as to its findings with regard to the April 25, 1967 sanction order. We find no merit to this argument. Counsel for the plaintiffs had the opportunity at the outset of trial, to inform the jury as to the issues involved in the case. Since the opening statement of the plaintiffs has not been included in the record on appeal, we must assume that the jury was, in fact, so informed by counsel. The transcript of the voir dire examination of prospective jurors, moreover, reveals that the plaintiffs' counsel informed each prospective juror that the issue of negligence had been decided favorably to the plaintiffs and that the trial court would instruct the jury accordingly; the plaintiffs' counsel then asked each juror whether he would have any objections to following such instruc-

32. *See, e. g.,* State v. Taylor, 9 Ariz. App. 290, 451 P.2d 648, 652 (1969); State v. Simmons, 59 Wash.2d 381, 368 P.2d 378, 382 (1962).

33. Washington v. People, 455 P.2d 656, 658 (Colo.1969); State v. Robinson, 75 Wash.2d 230, 450 P.2d 180, 181 (1969).

tions. The trial court having correctly instructed the jury on the issues remaining at the end of the trial, we find that no error was committed in failing to inform the jury of the court's ruling at the beginning of the trial.

The plaintiffs next contend that the court improperly refused to allow into evidence the findings of fact and conclusions of law entered by the superior court pursuant to the sanction order of April 25, 1967. It is the assertion of the plaintiffs that language contained in those findings and conclusions was relevant to the issue of gross negligence, that the issue of gross negligence was submitted to the jury, and that therefore, prejudicial error was committed in refusing to introduce these findings.

However, the plaintiffs' counsel is mistaken in stating that the issue of gross negligence was submitted to the jury. As previously pointed out, gross negligence was apparently placed at issue only to controvert the defendant's claim of contributory negligence; when the trial court ruled, after the defendant had presented his evidence, that the defense of contributory negligence had not been established, gross negligence became irrelevant. Contrary to the statement made in the appeal brief of the plaintiffs, the instructions of the trial court made no reference to the issue of gross negligence. Thus, there is no merit to the plaintiffs' argument on this point.

The plaintiffs raise the additional argument that because of the admissions made by defense counsel on the issue of the existence of a defect in the exhaust system, the plaintiffs were entitled to summary judgment on their claim of breach of warranty. Our previous holding on the subject of strict liability and contributory negligence is dispositive of this issue. The trial court correctly ruled, at the outset of trial, that the defendant should be allowed the opportunity to prove the defense of contributory negligence.

▮ It is further maintained by the plaintiffs on appeal that the trial court was mistaken in refusing to grant a mistrial when the plaintiffs' counsel introduced evidence of misconduct by one of the jurors. It is claimed that one Bobby Fox was in constant attendance during the first twelve days of the trial. According to the plaintiffs, Fox had been discharged from a position at Clear, Alaska, as the result of testimony given at a hearing by plaintiff Tom Martin. It is further maintained that Fox kept close company with one of the jurors when the trial was not in progress. All of this information was brought to the attention of the trial court in a motion for mistrial, but the motion was denied. The plaintiffs admit that there was no actual proof of misdeeds by either Bobby Fox or the juror with whom he associated, yet it is contended that the circumstances warranted the granting of a mistrial.

It is established in Alaska that the granting or refusal of a new trial rests within the sound discretion of the trial judge, and that the Supreme Court will interfere only in exceptional circumstances, in order to prevent a miscarriage of justice. Peters v. Benson, 425 P.2d 149, 152–153 (Alaska 1967). This rule is eminently sensible, since the trial court judge will in almost all cases be in a far better position to assess the situation which has given rise to the motion. In the present case, we find no abuse of discretion in the court's action. As is admitted by the plaintiffs, there was no direct evidence of actual misconduct. In this situation, the trial judge was in a position to observe and assess the demeanor and conduct of Fox and the juror, and to rule thereon. Accordingly, we find that the denial of the motion for mistrial was a proper exercise of discretion by the court.

▮ In their final allegation of error, the plaintiffs contend that the court improperly submitted to the jury verdict forms which would have allowed it to return no damages whatsoever. Included in this point is the contention that the court improperly instructed the jury that, if the jury found any of the plaintiffs entitled to

no damages, the word "none" was to be written on the appropriate verdict form. Because there were, as to each of the plaintiffs, at least some elements of damages which were uncontested, and because the issue of liability had already been concluded, we think that it was, in fact, error for the court to submit forms and give instructions which would have allowed no award to be given. Nevertheless, in our estimation the prejudicial effect, if any, of such an error, would at most be very slight. In view of the substantial awards made by the jury, we conclude that the error could not have substantially prejudiced the plaintiffs, and that it does not call for reversal.

For the reasons stated in this opinion, the judgment of the trial court is affirmed.

CONNOR, J., not participating.

RABINOWITZ, Justice (dissenting in part).

In dissenting in Bachner v. Pearson, 432 P.2d 525, 528–533 (Alaska 1967), I concluded that the trial court's establishment-preclusion order, imposed as a sanction pursuant to Civil Rule 37(b) (2) (a), was unwarranted. Despite law of the case considerations, I am constrained to adhere to the views expressed in my dissent for I believe the court's initial affirmance of this discovery sanction was manifestly erroneous.[1] Now that the precise contours of this establishment-preclusion order have for the first time been definitively determined, by resort to the totality of the record and discovery policies, it appears that the due process issues which I considered incipient at the first appeal have fully materialized.[2] I therefore dissent from that portion of the Bachner appeal which is bottomed on affirmance of the trial court's establishment-preclusion order. I

am in agreement with the extension of the doctrine of strict liability, as expounded in Clary v. Fifth Avenue Chrysler Center, Inc., 454 P.2d 244 (Alaska 1969), to leases in a commercial setting and am in further agreement with all other facets of the Bachner appeal. I am in full agreement, and join in, the court's disposition of Pearson's appeal.

---

1. Patrick v. Sedwick, 413 P.2d 169, 173 (Alaska 1969); Watts v. Seward School Bd., 421 P.2d 586, 618 (Alaska 1968).

2. Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); Hammond Packing Co. v. Arkansas, 212 U.S. 322, 29 S.Ct. 370, 53 L.Ed. 530 (1909); Hovey v. Elliot, 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215 (1897); Civ.R. 37(b) (1); Note of Advisory Committee on Rules to Rule 37, Fed.R.Civ.P.