**Betty Knight KRITSER, Roy G. Mason, et al., Plaintiffs-Appellees-Cross Appellants,**

**v.**

**BEECH AIRCRAFT CORPORATION, Defendant-Appellant-Cross Appellee.**

**No. 72–2287.**

United States Court of Appeals, Fifth Circuit.

May 31, 1973.

W. B. Patterson, Jack Pew, Jr., Dallas, Tex., R. A. Wilson, Amarillo, Tex., for appellant.

Daniel C. Cathcart, Los Angeles, Cal., Jim F. Fullingim, Amarillo, Tex., for appellees.

Before JOHN R. BROWN, Chief Judge, and WISDOM and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

In this Texas diversity case involving personal injuries and a death from an airplane crash, defendant Beech Aircraft Corporation appeals from a judgment awarded in favor of an injured passenger and the surviving beneficiaries of the dead pilot. Appellant contends that plaintiffs did not produce sufficient evidence [1] to support the jury's findings concerning a defective fuel system in the airplane which is alleged to have been the cause of the accident. Plaintiffs cross-appeal from the district judge's refusal to submit the issue of punitive damages to the jury. We affirm.

The airplane, a Baron Model D–55 manufactured by Beech Aircraft, was relatively new and had flown less than 100 hours. The pilot, David S. Kritser, was qualified to fly multi-engined aircraft such as the twin-engined Baron.

---

1. As expressed in the appellant's brief, two of the issues are as follows:

　　1. "Whether the opinion testimony of plaintiffs' expert, assuming facts not included in the hypothetical question and predicated on conjecture and pyramiding of inferences upon inferences, should have been stricken from evidence by the district court upon defendant's objection."

2. "Whether plaintiffs' proof of fuel displacement in the right main fuel tank (the only defect found by the jury)—which proof was predicated on conjecture and the pyramiding of inferences upon inferences—was sufficient to take plaintiffs' case to the jury over defendant's motion for instructed verdict and to support a judgment for plaintiffs over defendant's motion for judgment notwithstanding the verdict."

On October 25, 1968, at about 9 o'clock in the morning, he began a flight from Amarillo, Texas, with Roy Mason as a passenger. They stopped in Lubbock briefly to pick up another passenger, Lowry McCathern, and from there flew to Monahans. The total distance was approximately 227 nautical miles, resulting in an estimated fuel consumption of at least 23 gallons in each of the two 40-gallon main tanks. Each tank was estimated to have about 14 to 17 gallons at the time of the crash.

As the airplane approached the Monahans runway with landing gear down, witnesses on the ground noticed the right engine fluttering and backfiring. Despite the pilot's efforts to regain altitude, the plane rose only slightly before spinning and falling toward the ground. Both Kritser and McCathern were killed by the ensuing impact. Although Mason survived, he sustained serious personal injuries.

 Kritser's wife and children sued Beech Aircraft for damages arising from his death, as provided by 13A Vernon's Annotated Revised Civil Statutes of Texas article 4675 (1952). In a separate action Mason sued Beech Aircraft for his personal injuries. The cases were consolidated under Rule 42(a), Federal Rules of Civil Procedure, and tried before a jury on the theory of strict liability under Texas law for a defective product. To recover compensatory damages, plaintiffs had the burden of proving not only that defendant sold the Baron in a defective condition unreasonably dangerous to the user but also that such defective condition was a proximate cause of the accident. *See* 2 American Law Institute, Restatement of Torts,

Second, § 402A (1965); Technical Chemical Co. v. Jacobs, 480 S.W.2d 602, 604 (Tex.1972); McKisson v. Sales Affiliates, Inc., 416 S.W.2d 787, 790 (Tex. 1967); Welch v. Outboard Marine Corp., 5 Cir., 1973, 481 F.2d 252, 254; [No. 72-1974, April 20, 1973, pp. 5-6], Olsen v. Royal Metals Corp., 5 Cir., 1968, 392 F.2d 116. Punitive damages are allowed under Texas law when death is caused by defendant's "wilful act, or omission, or gross neglect." *See* 3 Vernon's Annotated Constitution of Texas article 16, § 26 (1955).

Plaintiffs focused on an alleged defect in the fuel system of a Baron aircraft similar to that piloted here by Kritser. Because the Baron wing tank contains no internal device such as a baffle to restrain the movement of fuel away from the fuel outlet located in the aft, inside corner of the tank, there is an interruption or "porting" of the fuel supply to the engine when the plane engages in certain flight maneuvers. One such maneuver is known as a "slip." To accomplish a slip, the pilot lowers one wing and then applies the rudder in a direction opposite the lowered wing. The nose of the plane does not turn, but the plane slips sideways. Resulting forces displace the fuel away from the fuel outlet of the tank in the lowered wing.[2] Then air instead of fuel flows from the tank to the engine, and the engine misfires and loses power.

Perhaps the most serious question in this case is whether a slip occurred. Mason testified that as the plane came into the Monahans area and just prior to approaching the runways the pilot dipped the right wing so that they could observe a large pipe yard out to the right of the aircraft.[3] Plaintiffs intro-

---

2. According to a Flight Training Handbook published in a revised form in 1965 by the Federal Aviation Agency, a slip was formerly used as a normal means of controlling landing descents to short fields, but a slip is now used primarily during crosswind landings and emergency landings away from airports.

3. The relevant portions of Mason's testimony are as follows:

Q Well, let me put it a different way. Is there some place after you left Lubbock where you have no further recollection until after the accident?

A I remember our approach into Monahans, the Monahans area, where I could see the airfield, runways, and just prior to approaching the runways I noticed a large pipe, or I think Mr. McCathern made the statement there is a

duced an expert witness, David Haddon Holladay, to explain what then happened. In Holladay's opinion, based on facts in the record, to prevent the aircraft from then turning to the right while the wing was dipped to the right, the pilot was obliged "to apply some left rudder." This maneuver then produced a slip causing displacement of the fuel in the right wing tank, which in turn caused fuel starvation in the left wing tank. The pertinent portions of this critical testimony are set forth in the margin.[4]

lot of pipe in somone's yard out to the right of the aircraft, and I think that he said it was a Halliburton yard, and it was to the right of the airplane, and I think we made kind of a slight bank, you know, just looking out the window and looking at it. This is the last thing that I recall prior to coming to on the ground.

. . . . .

Q Was the airplane banking is what I'm getting at?
A I think there was a slight turn.
Q In which direction?
A Or bank to the right.

. . . . .

Q Where, if you can just think back for just a moment, was the Halliburton yard, straight off the right wing of the airplane, a little bit ahead of it, or a little bit behind?
A My first notice was just off to the right.
Q Straight out to the right about ninety degrees to the airplane?
A Yes, sir.
Q What is the next thing that you remember?
A Coming to on the ground.
Q Were you aware of any malfunction or problem at the time that he banked the airplane and you looked out to the Halliburton yard?
A No, sir.

Mason's memory of a "slight turn" is not inconsistent with a slip maneuver. During a slip when the right wing is lowered, there is still a sideways motion toward the right while the nose of the plane is yawed back toward the original flight path by the application of left rudder. The longitudinal axis of the aircraft lies at any angle to the flight path as the slip continues.

Mason's testimony about the Halliburton yard being "straight off the right wing" at the time of the dip does not preclude an inference that the dip occurred a sufficient time before the plane reached a point where the engine began backfiring.

4. Before Holladay testified, plaintiffs introduced the deposition of Francis Roth, who was employed as an "Air Safety Investigator" by the National Transportation Safety Board at the time of the accident. He went to the scene and investigated the aircraft on the day of the accident. He later tore down both engines to check for abnormalities; in particular, he examined the magnetos, spark plugs, and the fuel injection system of the right engine. Roth's examination failed to disclose any pre-accident malfunction or failure. The wreckage was essentially intact, and the cables were still attached to the primary flight control surfaces of the aircraft. Both the left and right fuel selectors were positioned for the main tanks, and the throttle was full forward. When he stuck a dip stick in the tanks, he found the stick indicated two or three inches of fuel remaining.

The salient part of the hypothetical question, based on facts in the record, posed to Holladay by plaintiffs' counsel was as follows:

Q (By Mr. Cathcart) In addition to the facts set forth in Mr. Roth's deposition, I want you to further assume that post-accident tear down of the engine and accessories failed to reveal any mechanical discrepancies or deficiencies which preceded the accident. An examination performed on the pilot, both pathological and toxicological, failed to reveal any preexisting problem of that nature which would have played a role in this accident;

. . . .

I want you to further assume, sir, that certain eye witnesses saw the aircraft in the vicinity of the Monahans Airport; . . . the aircraft was seen by a telephone repairman who was on the ground . . . . [T]he aircraft was on what he described as its base leg; he then saw it turn inside his position onto the final leg; as the aircraft went by him he noted that the landing gear was extended and that the flaps were extended; he then looked away from the aircraft, back to his work for a brief period of time, and then looked up again and saw the aircraft continuing to lose altitude; as it was in a descent altitude back here as it turned onto final, it disappeared behind some trees and went temporarily out of his

At the close of all the evidence, the district judge propounded written special issues to the jury with space provided for the jury to write in an answer. *See* Rule 49(a), Federal Rules of Civil Procedure. In the section of questions regarding defects in the aircraft, the jury answered in essence as follows:

Just prior to the crash on October 25, 1968, there was a displacement of fuel from the fuselage], and chordwise [parallel to the fuselage], resulting in starvation of fuel to the first, right engine, and a loss of power and then resulting in fuel starvation to the left engine and a loss of power.

Q And can you give us your reasons for your opinion, sir?

A Yes, sir.

Q All right. Will you tell us what they are?

A The aircraft is proceeding on the final approach and the right wing of the aircraft is lowered for the purpose of looking at the material in the yard, it would be necessary for the pilot to apply some left rudder in order to prevent the aircraft from turning to the right. At that instant fuel would have been displaced spanwise and chordwise in the right fuel tank. As a result of that displacement, fuel starvation to the right engine would have occurred. The right engine propeller would then have slowed in its rotation, and that would account for the observation of the witness in observing the slowing of the propeller, and for his hearing of the sounds being made by that engine as if it were running out of gas. As a result of the loss of that engine on the right side, there would have been a condition of asymmetric or disproportionate thrust. The aircraft would have yawed to the right, causing a rotation to the right around the vertical axis. That, in turn, would have required that the pilot apply left aileron and apply left rudder in order to keep the wings of the aircraft level.

At that point, fuel would have been displaced spanwise and chordwise in the left fuel cell of the aircraft, and the left engine would then have experienced fuel starvation and power loss. At that instance the pilot would in all probability have been in the process of attempting emergency procedures to take care of or to remedy the condition of failure, which had already occurred in the right, or Number Two, engine. As a result of his attempts to remedy that, he would have been giving his attention to that problem when the second, or the left engine failure occurred. . . .

view; the next time he saw the aircraft it appeared to be heading approximately west and climbing slightly; it then seemed to go out of control, nose down in a rotation to the aircraft's right and disappeared from his view; within a few seconds after he saw that he heard a sound which sounded like an engine revving up high.

I want you to further assume that another witness . . . was attracted by the airplane . . . . [T]his witness indicated that the landing gear was extended, the aircraft's wings were rocking somewhat and the right engine propeller did not seem to be turning like the left engine, but was kicking over, slowing down, kicking over and slowing down, and was making unusual sounds which he described like when you run out of gas; . . . it disappeared behind some trees and structures so that his view of the remaining portion of the flight was obstructed; the aircraft itself came to rest on an extension of runway . . . . .

. . . . .

I want you to further assume, sir, that the surviving passenger in the aircraft, a Mr. Mason, recalls that the aircraft being on final, recalls some mention of the Halliburton yard and a stack of pipe in the Halliburton yard, . . . and that in order to look out the right side and see the yard, the wing was lowered slightly.

Please further assume that at the scene of the accident, in addition to the facts set forth in Mr. Roth's deposition, and those disclosed in the photographs, eye witnesses both smelled and observed fuel leaking from the rear of the right wing and the rear of the left wing.

Based, sir, on your experience, knowledge, testing of the Baron and the information contained in the hypothetical question, are you able to give us an opinion of a probable cause of this accident?

A Yes, sir.

Holladay, after answering that he was able to give an opinion, was asked what was the probable cause of the accident:

Q And what is that question?

A The probable cause of this accident is fuel displacement spanwise [away

in the right main fuel tank, but not the left main fuel tank, which displacement resulted in an uncovering of the fuel outlet of the tank. [Section I(a)]

The two 40-gallon main fuel tanks were not reasonably fit for the purposes for which they were intended in that they were defective in design and unreasonably dangerous because of the fuel displacement under certain flying conditions. [Section I(b)] Such defective design as found was a producing cause of the crash of the aircraft.[5] [Section I(c)(1)]

Such defective design was a proximate cause of the crash of the aircraft. [Section I(c)(2)]

The jury's answers to questions concerning directions and precautionary warnings given by Beech Aircraft to Kritser, relative to operation of the aircraft, were in essence as follows:

The current flight manual supplement issued by Beech Aircraft about August of 1968 gave notice to Kritser that under some circumstances there could be a displacement of fuel in the main fuel tanks which could result in an uncovering of the fuel outlet of the tank. [Section III(a)]

Kritser had actual knowledge and notice of the flight manual supplement issued by Beech Aircraft stating:

"Flight operation 'CAUTION' To prevent fuel flow interruption, avoid prolonged operation in a slip or skid attitude under low fuel conditions." [Section III(b)]

The district judge did not charge the jury on punitive damages because of the notice which defendant gave. Nevertheless, Beech Aircraft was still held liable for compensatory damages since the jury made the following findings in the second section of the questions about Kritser's acknowledgment of Beech Aircraft's directions and warnings:

Kritser followed Beech Aircraft's recommended single-engine procedures as set out in the owner's manual. [Section II(a)(3)] Kritser operated the aircraft in conformity with Beech Aircraft's "Flight operation 'CAUTION'" stated in the flight manual supplement. [Section II(a)(4)]

From the jury determination that Kritser obeyed the flight manual and still encountered engine fuel starvation from porting of the right fuel tank, the district judge concluded that the manual's directions and warnings did not absolve Beech Aircraft of responsibility for the accident and, accordingly, overruled defendant's motions for a directed verdict, judgment notwithstanding the verdict, and judgment on the verdict. The final judgment, based on jury determinations regarding the quantum of damages, awarded Betty Knight Kritser $218,000, David S. Kritser $5,000, John Knight Kritser $12,000, Ann Elizabeth Kritser $15,000, and Roy G. Mason $60,000.

## I.

■ Beech Aircraft raises several issues on appeal. The primary one relates to the district court's refusal to direct a verdict on the insufficiency of evidence to prove that the right main tank ported.

Our review of a jury determination is limited, as we said in Boeing Company v. Shipman, 5 Cir., 1969, 411 F.2d 365, 374 (*en banc*):

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case —but in the light and with all reasonable inferences most favorable to the

---

5. At first, the jury was asked whether the defect was *the* producing cause, and it answered negatively. To clear up the jury's confusion and to obviate the possible inconsistency between I(c)(1) and (2), the district judge properly rephrased I(c)(1) to ask whether the defect was a producing cause, and the jury answered affirmatively.

party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses. See also Dun & Bradstreet, Inc. v. Miller, 5 Cir., 1968, 398 F.2d 218. We have already referred to the evidence presented by the plaintiffs which was sufficient to raise a factual conflict to be resolved by the jury.

Appellant contends that Holladay's opinion depends on an assumption, i. e., that the pilot applied left rudder during the right dip, which is not proven by any facts in the evidence.[6] In our view, however, Holladay drew a reasonable inference rather than make an unwarranted assumption of fact. Apparently the jury agreed. See generally Sentilles v. Inter-Caribbean Shipping Corp., 361 U.S. 107, 109–110, 80 S.Ct. 173, 175–176, 4 L.Ed.2d 142 (1959); Central Gulf Steamship Corp. v. Sambula, 5 Cir., 1968, 405 F.2d 291, 301–302. Holladay's testimony that "it would be necessary for the pilot to apply some left rudder in order to prevent the aircraft from turning to the right," was based in part on Mason's testimony about a dip of the right wing "just prior to approaching the runways." This testimony about use of left rudder by the pilot and the succeeding porting and engine fuel starvation was also warranted by testimony precluding other possible hypotheses.

Although the jury concluded that the left wing tank did not port, its conclusion did not vitiate Holladay's testimony about porting of the right wing tank. His opinion that stalling of the right engine would lead to porting of the left tank does not negate the correctness of his view about the earlier event of the porting of the right tank, since the earlier event was not dependent upon the later event. The jury might properly

6. Appellant contends that our decision in Rewis v. United States, 5 Cir., 1966, 369 F.2d 595, shows that there was no probative value in Holladay's testimony. Rewis involved a tort claim of medical malpractice in the treatment of a child suffering from an overdose of aspirin poisoning. The treating physician at an army hospital examined the child late one night. He observed her to be in an excited condition and breathing rapidly. After the child's father told the doctor that the child had not taken any drugs, the doctor diagnosed the child to have a viral infection. Because the doctor failed to diagnose aspirin poison, the child did not get the immediate treatment necessary for any chance of survival. At the trial, an expert witness testified that the treating physician's diagnostic procedure was inadequate, since he did not continue the examination to determine the cause of rapid breathing. Thereafter, the expert qualified his opinion. Based on a supposition that the child was *crying vigorously* he decided that it would be difficult to diagnose the child properly. The problem with his second opinion was a lack of any proof that the child ever cried. Following the district court's judgment in favor of defendant, plaintiffs appealed. Since we concluded that the district court may have accepted the expert's second opinion based on improper assumptions, rather than the original opinion which did not include the assumptions, we reversed and remanded for a new trial. At the same time we noted that plaintiff need not exclude every other possible hypothesis in proving causation. Furthermore, expert testimony is appropriate to determine a reasonable medical probability.

accept the first step of his opinion without conceding the second. *See* Remington Arms Co., Inc. v. Wilkins, 5 Cir., 1967, 387 F.2d 48, 54.

Appellant also contends that the district judge should have entered judgment for defendant based on the jury's findings that Beech Aircraft gave Kritser notice about danger of displacement of fuel "under some circumstances" and that Kritser had actual knowledge of the warning against "prolonged operation in a slip or skid attitude under low fuel conditions." As authority, appellants rely on the Restatement of Torts, Second, § 402A, comment j; Helene Curtis Industries, Inc. v. Pruitt, 5 Cir., 1967, 385 F.2d 841, 861; Ward v. Hobart Mfg. Co., 5 Cir., 1971, 450 F.2d 1176, 1188.

According to comment j in the Restatement, a seller may be required to give a warning in order to prevent a product from being unreasonably dangerous. Then the product "is not in a defective condition" if the product "is safe for use" when the warning is followed. Beech Aircraft cannot simply give a general warning. The warning must be adequate to make the airplane safe when the warning is followed. Here the jury expressly found that Kritser followed the recommended procedures set out in the owner's manual and operated the aircraft in conformity with the warning against prolonged slips under low fuel condition and further found that the fuel system defect still proximately caused the accident. Thus, the warning was inadequate to make the product safe.

In *Ward* the Court was concerned with defendant's allegedly negligent failure to warn about the dangers of using a meat grinder. We noted that plaintiff was conscious of the consequences of inserting her hand in the meat grinder while it was operating, so it seemed superfluous to require the manufacturer to issue a warning against a known danger. Accordingly, we reversed the judgment against the defendant manufacturer. But the dangers from a meat grinder are obviously more apparent than the hidden dangers from displacement of fuel within the airplane's fuel tank. Beech Aircraft's responsibility was not discharged by raising the specter of danger "under some circumstances," such as "prolonged operation in a slip . . . under low fuel condition," without defining "prolonged" or "low fuel condition." A subsequent warning issued by the company,[7] which does define the ambiguous terms, confirms the deficiency of the earlier warning:

> CAUTION: To prevent fuel flow interruption, avoid prolonged operation (20 seconds or longer) in a slip or skid attitude with the main tanks less than one-half full.

The *Helene Curtis* case was continually cited and discussed by appellant, not only in briefs but also in a letter to this Court following oral argument. The *Helene Curtis* case concerns the scope of duty imposed by strict liability. Where the manufacturer produced a product which was not marketed for use by the ordinary customer and warned "FOR PROFESSIONAL USE ONLY—NOT FOR PUBLIC SALE," we held that the manufacturer could not be held liable for any damages suffered following an unforeseeable resale by a beauty parlor to an amateur beautician who was injured by the product. The case is inapposite here because Kritser was clearly an intended user of the airplane.

## II.

We believe the district judge properly refused to submit the issue of punitive damages to the jury.[8] His de-

---

7. The warning was issued by the company on August 30, 1968, but not received by Kritser.

8. The district judge excluded certain of plaintiffs' evidence of ground tests, as opposed to in-flight tests, which were intend-

cision was made after the jury determined that Beech Aircraft gave Kritser notice of fuel displacement under some circumstances and warned him against prolonged slips. The fact that the company took such steps to inform Kritser of potential danger absolved Beech Aircraft of liability only for punitive but not compensatory damages. The defendant did not exhibit the conscious indifference toward the public which generally typifies gross negligence, *see generally* Wooley v. Southeastern Portland Cement Co., 5 Cir., 1959, 272 F.2d 906, 909, and there is no evidence that it committed any wilful act or omission.

Affirmed.

ed to show that defendant knew of the dangerous fuel system in normal ground operations. His reasons for excluding the evidence indicate that he acted within the bounds of his discretion:

> All right. Gentlemen, I have given this question that is immediately before us a lot of attention, and I have come to the conclusion that reports and testimony and evidence on tests made other than in-flight conditions, and I'm referring specifically to what has been referred to as rolling takeoff type test, should be excluded. Although I recognize that the phenomena that might exist on the ground would be somewhat related to what happens in the air, it just appears to me that the circumstances and conditions are too different. A couple of things stick in my mind. Obviously, the ground affords more friction than the air does, although both afford friction. Secondly, on a rolling type takeoff, you have a sharp turn on the ground going onto the runway that just wouldn't be available, just not performable in the aircraft in the air.
> . . .