595 P.2d 751
598 P.2d 641

Barbara J. RUDISAILE, Personal Representative, Surviving Spouse and Executrix of the Estate of Stanley E. Rudisaile, Deceased, Plaintiff-Appellee,

v.

HAWK AVIATION, INC., a New Mexico Corporation, Defendant-Appellant.

No. 3096.

Court of Appeals of New Mexico.

Sept. 5, 1978.

Reed L. Frost, John E. Schindler, Palmer & Frost, P. A., Farmington, Tom Davis and George M. Fleming, Byrd, Davis & Eisenberg, Austin, Tex., for plaintiff-appellee.

Byron Caton, Tansey, Rosebrough, Roberts & Gerding, P. C., Farmington, for defendant-appellant.

OPINION

LOPEZ, Judge.

The plaintiff-appellee brought a wrongful death action for the death of her husband as a result of an airplane crash. The trial court sitting without a jury found for the plaintiff and awarded damages in the sum of $235,000.00. The defendant appeals. We reverse.

We discuss the following issues: (1) whether strict liability in tort should apply to the facts of this case; and (2) whether the affirmative defenses of contributory negligence and assumption of the risk should have been applied.

*Facts*

This action arose from an airplane accident which occurred on September 30, 1974 near Farmington, New Mexico. The defendant owned and operated an FAA certified field operation at the Farmington Municipal Airport. The plaintiff's decedent, Dr. Rudisaile, was a qualified pilot and the sole occupant of a Piper Cherokee 140 E which had been rented from the defendant.

On September 30, 1974, Alan Hawkinson, the defendant's acting flight instructor, flew the Cherokee 140 E on three separate flights. At the end of the third flight, Mr. Hawkinson delivered the aircraft to Mr. Maxwell, one of defendant's employees, for a scheduled oil and oil filter change. Mr. Maxwell drained the oil and replaced the oil filter, but failed to replenish the oil that

had been drained from the engine. He did, however, make an entry into the aircraft engine log book that the oil filter and oil had been changed. Dr. Rudisaile arrived at the office of the defendant, conversed with Mr. Hawkinson, and proceeded to the aircraft. Maxwell handed the engine log book to him. The doctor took the log book, climbed into the right front seat of the aircraft, started the engine, and taxied to the runway. The doctor did not make the customary pre-flight check of the aircraft prior to take-off. He took off from the Farmington Airport at about 3:36 p. m. The last visual contact Farmington's FAA air traffic control tower had with Rudisaile's aircraft was about two miles from the crash site.

The defendant filed findings of fact which asked the court to find that the proximate cause of the crash was the decedent's failure to obey federal air regulations; that the decedent knew or, by the exercise of reasonable care, should have known that the aircraft did not have oil; that such act or omission was a proximate cause of the crash; that there was no product defect in the aircraft and that insufficient oil in the aircraft engine was not an inherent defect in the engine, but was a failure by defendant, Hawk Aviation, Inc., to properly service the aircraft for users such as plaintiff's decedent.

The defendant also filed conclusions of law which asked the court to conclude that plaintiff failed to prove that the proximate cause of the crash was the negligence of the defendant; that the facts proved in this case do not support the application of the law of strict liability in tort; and that the decedent was contributorially negligent.

The trial court denied the defendant's requested findings and conclusions, filed its own findings and conclusions and entered judgment.

The following are the pertinent findings and conclusions of the trial court:

*Findings of Fact*

1. On September 30, 1974, defendant rented an airplane owned by defendant to the deceased Stanley E. Rudisaile, a qualified pilot.

2. Defendant was regularly engaged in the business of renting airplanes to qualified pilots of the general public.

3. The airplane rented to the deceased Stanley E. Rudisaile was expected to and did reach him, the user, without substantial change in the condition in which it was rented.

4. Prior to leasing the airplane to the decedent the oil had been drained from the engine and not replaced.

5. The defendant rented a defective product, an airplane without oil in the engine, which was unreasonably dangerous to the user, decedent.

6. The decedent took off in the rented airplane and shortly thereafter the airplane crashed about five miles southwest of the airport.

7. As a result of the injuries received in the crash the decedent died on October 1, 1974.

8. The proximate cause of the crash and resulting death of decedent was lack of oil in the engine.

9. The decedent used the rented aircraft for the purpose for which it was intended to be used.

*Conclusions of Law*

2. The defendant as lessor of the airplane which was in a defective condition reasonably dangerous to the decedent is strictly liable in tort for the decedent's death.

.    .    .    .    .

4. The decedent did not misuse the airplane rented to him by defendant.

Defendant filed a motion for a new trial. The motion for new trial was denied. Subsequently, this appeal was filed.

Point I

*Does strict liability in tort apply to the facts of this case?*

The question of whether the doctrine of strict products liability is applicable is one

of law to be decided by the court. See *Southern Union Gas Co. v. Briner Rust Proofing Co.,* 65 N.M. 32, 331 P.2d 531 (1958); *First Nat. Bk., Albuquerque v. Nor-Am Agr. Prod. Inc.,* 88 N.M. 74, 537 P.2d 682 (Ct.App.1975).

New Mexico has accepted the doctrine of strict products liability by adopting § 402(A) of the Restatement of the Law, Torts 2nd (1965) and extended it to lessors in *Stang v. Hertz,* 83 N.M. 730, 497 P.2d 732 (1972); *Bendorf v. Volkswagenwerk Aktiengeselischaft,* 88 N.M. 355, 540 P.2d 835 (Ct.App.1975), *cert. denied,* 88 N.M. 319, 540 P.2d 249 (1975).

Section 402(A) of the Restatement reads as follows:

> (1) One who sells *any product in a defective condition unreasonably dangerous* to the user or consumer or to his property is *subject to liability for physical harm* thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the *seller is engaged in the business of selling* such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

The question presented in the instant case is whether an airplane which has no oil in it constitutes a defect under § 402(A) of the Restatement of Torts.

Justice Traynor, in *Greenman v. Yuba Power Products, Inc.,* 59 Cal.2d 57, 27 Cal. Rptr. 697, 700, 377 P.2d 897, 900 (1962), held that a manufacturer was held strictly liable in tort when he placed an article on the market knowing that it was to be used without inspection for defects, and the article proved to have a defect that caused injury to a human being. The reasons for imposing strict liability include the difficulty in proving the negligence of a manufacturer because of the manufacturing process involved and the latency of the defect. In addition, for policy reasons, courts desire to insure that the cost of defective products are borne by the manufacturers who put such products on the market, and not borne by the injured persons who are powerless to protect themselves.

The trial court erred in concluding that the doctrine of strict liability applied in this case. The explanation of defect set out in *Stang,* supra, as quoted from *Lechuga, Inc. v. Montgomery,* 12 Ariz.App. 32, 467 P.2d 256 (1970) is as follows:

> " 'Inherent in these policy considerations is . . . the character of the defect itself, that is, one occurring in the manufacturing process and the unavailability of an adequate remedy on behalf of the injured plaintiff.' "

Such is not the case here. The airplane rented to the decedent had no hidden or latent defects which could not be discovered by the exercise of reasonable care. There is a great difference between a "defect" which would warrant the imposition of strict liability in tort and a condition causing physical injury which results from negligence.

The aircraft in this case was not "defective" in the sense intended by § 402(A), supra. The plane simply had no oil. This condition was caused by negligence, and involved conduct which was not intended to be subject to strict liability in tort.

Point II

*Affirmative defenses of contributory negligence and assumption of risk should be applied.*

The defendant argues that decedent was an experienced pilot and thus, contributory negligence or assumption of the risk should have been applied because of the decedent's failure to discover the lack of oil. In Point I we determined that strict liability in tort does not apply to the facts of this case. Therefore, the defenses available under a negligence theory would be applicable. We make no comment on the merits of these defenses. Further, because Point I is dispositive of this appeal, we do not address the other issues raised by appellant.

The trial court's judgment is reversed and the case remanded for proceedings consistent with this opinion.

IT IS SO ORDERED.

HERNANDEZ, J., concurs.

SUTIN, J., dissenting.

SUTIN, Judge (dissenting).

I dissent.

A. *Defendant did not challenge findings of fact, and judgment must be affirmed.*

Defendant did not properly challenge the specific findings set forth in Judge Lopez' opinion, nor properly refer either to the place where the findings are found in the transcript or to the point in the argument where the findings are challenged. Defendant states in its Brief-in-Chief, p. 3:

> While factual issues were contested at trial, no substantial evidence appeal is being taken from the trial judge's decision.

Where the findings are not challenged, we may assume the findings are correct and conclusive on appeal, *State ex rel. Newsome v. Alarid,* 90 N.M. 790, 568 P.2d 1236 (1977), and where the findings are supported by substantial evidence, this judgment must be affirmed.

Judge Lopez disregarded the findings of the court and pursued an erroneous path of the law to reverse.

*State ex rel. Newsome* has intruded upon prior decisions of the Supreme Court and this Court in its application of Rule 9(m)(2) of the Rules Governing Appeals [§ 21–12–9(m)(2), N.M.S.A.1953 (Repl.Vol. 4, 1975 Supp.)]. It reads in pertinent part:

> If any *finding* is challenged, *it must be so indicated* by a parenthetical note referring to the appropriate numbered point in the argument, e. g.

EXAMPLE

. . . (Finding No. 5, Tr. 37, Challenged—Point Two). [Emphasis added.]

A fair reading of the phrase "it must be so indicated," gives this language a compulsory, mandatory, commanding force. However, there is no reference to what punishment shall be meted out to fit the crime of noncompliance. Generally, the Supreme Court suggests contempt proceedings directed to attorneys, but, instead, the Supreme Court has read into Rule 9(m)(2) the death knell of the appellant. *Tafoya v. Tafoya,* 84 N.M. 124, 500 P.2d 409 (1972) said:

> . . . Accordingly, we will not review the record or consider the claimed errors relied upon for reversal.

*Springer Corporation v. American Leasing Company,* 80 N.M. 609, 610, 459 P.2d 135, 136 (1969) said:

> . . . The trial court's findings are conclusive on appeal.

In *American General Companies v. Jaramillo,* 88 N.M. 182, 538 P.2d 1204 (Ct.App. 1975) this Court followed the decisive quotation from *Springer Corporation.*

*State ex rel. Newsome* said:

> . . . However, there is little dispute as to the facts; and the right to inspect public documents being an important public issue, and being squarely before us for the first time, *we will not, therefore, preclude review of the findings. Looking at the totality of the pleadings and the briefs we find that a sufficient challenge to the facts found by the trial court has been raised. We construe the requirement of our rule liberally in this case only, so that the cause on appeal may be determined on the merits.* [Emphasis added.] [90 N.M. at 793, 568 P.2d at 1239.]

What does this language mean? Under what circumstances are the trial court's findings conclusive on appeal? Are the findings conclusive on appeal within the discretion of an appellate court? Must we look to the totality of the pleadings and the briefs to determine whether a sufficient challenge to the facts has been found? Must we determine whether the issue of strict liability is an important public issue

squarely before us for the first time? Or must we determine from the sum total of the statements made in *State ex rel. Newsome, supra,* whether the trial court's findings are conclusive on appeal?

This Court is now left in a state of uncertainty. The intrusion made on prior decisions may indicate a desire that the problem be solved on a case to case basis; that the importance of the issue involved rises above the compulsory language of Rule 9(m)(2); that a common sense approach is more important than the death knell. Nevertheless, it is essential in the administration of the Rule in a search for justice that we do not play "ring around the rosy." In my opinion, Rule 9(m)(2) should have added thereto, the sanctions to be imposed upon noncompliance with the rule.

The Court of Appeals also evades and avoids Rule 9(m)(2) when it wants to reverse a case. We simply close our eyes to the existence of the rule. *Ortiz v. Ortiz & Torres Dri-Wall Company,* 83 N.M. 452, 493 P.2d 418 (Ct.App.1972), Sutin, J. dissenting. In *Ortiz,* I said:

> From at least 1915 through 1971, this rule has been a thorn in the side of attorneys who have not studied trial and appellate procedure. [83 N.M. at 456, 493 P.2d at 422.]

This thorn remains an affliction even to this day. Thus it has always been. Thus it will always be until sanctions are imposed upon non-compliance with the rule.

Inasmuch as the *Newsome* court stated in clear language that its decision was limited to "this case only," it means to me that *Tafoya, Springer Corporation* and *American General Companies, supra,* have not been modified and they remain in full force and effect. However, if certiorari is granted, the Supreme Court may, under the "liberal" doctrine stated in *State ex rel. Newsome* compel a determination of this case on the merits. We may feel compelled to do so in every case of substance and importance.

The trial court's decision is set forth in the majority opinion. In substance, the court found that defendant leased decedent an airplane, a defective product, without oil in the engine which was unreasonably dangerous; that shortly after taking off, the plane crashed and the proximate cause of the crash was lack of oil in the engine.

Preceding the decision, Judge Musgrove, the trial judge, entered a written "Opinion," a copy of which is attached hereto as "Appendix A." This procedure is the best and most fair method that a trial court can use in rendering assistance to the parties and to this Court. The evidence is set forth concisely, clearly, and it does not need repetition. The opinion supports the findings of the court. When a *learned* district judge has written a careful and full opinion to support a decision, we should not reverse the judgment entered unless we take care to point out any error or errors discovered. The majority opinion fails in this regard. I can find none.

To reverse the opinion and decision of the trial court *in this case* is to insult the hallowed rule that the function of this Court is to see that justice is done *according to law.* Judge Magruder of the First Circuit Court of Appeals of the United States once said:

> *We should never unnecessarily try to make a monkey of the judge in the court below, or to trespass on his feelings or dignity and self-respect.* . . . Sometimes we may have occasion to reverse a judge of the district court on a ground not presented to it, or considered below. If so, we should be at pains to point that out. *And if the district court has written a careful and full opinion, with which we agree, and which we feel unable to improve upon, we should affirm on the opinion of the court below.* Magruder, The Trials and Tribulations of an Intermediate Appellate Court, 44 Cornell L.Q. 1, 3 (1958).

I agree with the opinion written below. The majority opinion does not. The judgment below should be affirmed on this point. I now turn to the second.

B. *The meaning of the majority opinion.*

The majority opinion holds that the doctrine of strict liability does not apply to this

case because "The airplane rented to decedent had no hidden or latent defects which could not be discovered by the exercise of reasonable care," i. e., the airplane had open and patent defects that a pilot could have discovered. Therefore, the doctrine of strict tort liability faded away. No authority was cited for this conclusion.

The majority opinion also holds that under a negligence theory, the affirmative defenses of contributory negligence and assumption of risk should be applied.

The judgment was reversed and "remanded for proceedings consistent with the opinion." I interpret this to mean that after Judgment on Mandate any proceedings may be undertaken by the trial court and the parties as they see fit; except that plaintiff cannot pursue the doctrine of strict tort liability. Plaintiff can proceed further in implied warranty and negligent theories or any other claim for relief warranted by law. It is known that I disapprove use of the words "consistent with this opinion" because it often leaves trial courts and parties in a state of uncertainty.

This case is a matter of first impression in New Mexico. This will be remembered as a dark day in strict tort liability if the protection of the public is discarded in a lessor-lessee relationship of this nature. The majority opinion strays far from the development of the doctrine of strict tort liability, its policies and its purposes. It would do violence and thwart the basic purpose of the doctrine if a lessor of an airplane absent oil who puts a product in the stream of commerce in a defective condition unreasonably dangerous can escape liability to a user of the product who is within the class the doctrine was designed to protect.

The majority opinion has adopted an ultra conservative view to protect the manufacturer-seller-lessor of the product, even though this doctrine was established primarily for the protection of the consumer-user-lessee. The courts of this country have moved forward not backward in the development of this protection. They sought to protect the public from the hordes of products thrown into the stream of commerce. To do this, judges interpreted § 402A of Restatement, Torts 2d, to effect this purpose. The important factor to discern is whether the product used is safe when the product is used as it was intended to be used. "Hidden or latent defects" were injected by this Court into the tort of products liability to protect the lessor. No reasons are given and none have been found. Whether defects are hidden, latent, open, or obvious are factors which bear upon the user's knowledge of the danger involved. Hidden or latent defects as well as open and obvious defects can be discovered in the exercise of reasonable care. By use of this language, the majority opinion inserts a foreign object, the defense of conventional contributory negligence, into the tort of products liability. A rose is a rose and contributory negligence is contributory negligence—the failure to exercise ordinary care. The essence of a valid defense is an awareness by the user of the danger in the use of the product and the risk involved.

The majority opinion and defendant's position on this appeal evade the application of these established rules of law. The opinion does not reach the defense of contributory negligence and the defendant seeks its adoption as a defense in strict tort liability.

I shall now turn to the points raised by the defendant in this appeal.

### C. *Decedent's own conduct was not a defense in this case.*

Defendant's first two points may be discussed together: (1) the policy behind strict liability in tort does not apply to the facts in this case, and (2) decedent's own conduct should be a defense to strict tort liability.

If I understand defendant's position correctly, the law as it relates to decedent's own conduct is in a state of confusion as to the defense of contributory negligence; that decedent's conduct as an affirmative defense is an open question. There is general agreement, it says, that contributory negligence, in the sense of a failure to discover or guard against product defects, is

not a defense, but that "assumption of risk" does constitute an affirmative defense. Between these two concepts, apart from the failure to discover or guard against product defects, is there negligent conduct on the part of the plaintiff that should be an affirmative defense? The answer is "No."

The law does provide one other type of misconduct as a defense—misuse of the product that proximately contributed to the plaintiff's injury. As to this defense, there is much confusion as to whether or when it will be available as a defense. *Bendorf v. Volkswagenwerk, etc.,* 88 N.M. 355, 540 P.2d 835 (Ct.App.1975) (*Bendorf I*). "Strictly speaking," this is part of the denial of plaintiff's case, rather than an affirmative defense. *Bendorf I,* Sutin, J., specially concurring [88 N.M. at 365, 540 P.2d 835].

The trial court concluded that decedent did not misuse the airplane and this type of misconduct is not an issue in this appeal.

In strict tort liability law, the only affirmative defenses are "assumption of risk" and misuse of the product. "The crucial difference between strict liability and negligence is that the existence of due care, whether on the part of [the] seller or consumer, is irrelevant." *Berkebile v. Brantly Helicopter Corporation,* 462 Pa. 83, 337 A.2d 893 (1975). "It is consequently our opinion that contributory negligence, as a defense to strict liability in tort, should be limited to those cases where the plaintiff voluntarily and unreasonably encounters a known risk." *Bachner v. Pearson,* 479 P.2d 319, 329–330 (Alaska, 1970) cited in *Stang v. Hertz Corporation,* 83 N.M. 730, 497 P.2d 732 (1972), 52 A.L.R.3d 112 (1973). See *Williamson v. Smith,* 83 N.M. 336, 491 P.2d 1147 (1971); *Bendorf I,* Sutin, J., specially concurring [88 N.M. 355 at 363–364, 540 P.2d 835].

In strict tort liability, contributory negligence in the form of an unreasonable use of a product with an awareness of the dangers involved is the only defense available to the seller or lessor of the product.

*Bendorf I* and *Bendorf II,* 90 N.M. 414, 564 P.2d 619 (Ct.App.1977) have created a "causation" theory which allows a seller to escape the doctrine of strict liability. This theory may cause confusion. If a product is in a "defective condition unreasonably dangerous" to the user, and the use of the product has no relationship with the proximate cause of the accident, and the negligence of the user is the sole proximate cause of the accident, the user cannot recover damages. For example, if a leased airplane has a defective seat system, a defective tire, a defective propeller, and no oil in the engine, all unknown to the pilot, and the pilot takes off from the airport and negligently crashes into the tower, unaffected by the condition of the airplane, the pilot cannot rely on the doctrine of strict tort liability.

All of the foregoing constitute the types of misconduct of a plaintiff under which liability of a defendant can be determined. The conduct of the decedent as an affirmative defense is not an open question; it has been fixed.

In the instant case, defendant requested the trial court to find that "decedent . . . by the exercise of reasonable care, should have known that the aircraft did not have oil . . . and such act or omission was a proximate cause." Defendant's argument centers around the fact that "decedent failed to pre-flight his aircraft." Defendant seeks to establish conventional contributory negligence as a defense to strict liability, and to the defense theory set forth in *West v. Caterpillar Tractor Co.,* 336 So.2d 80 (Fla. 1976) that "lack of ordinary due care could constitute a defense to strict liability." In Florida the doctrine of comparative negligence was adopted. The court said:

We now have comparative negligence, so the defense of contributory negligence is available in determining the apportionment of the negligence by the manufacturer of the alleged defective product and the negligent use made thereof by the consumer. The ordinary rules of causation and the defenses applicable to negligence are available under our adoption of the Restatement Rule. If this were not so,

this Court would, in effect, abolish the adoption of comparative negligence. [336 So.2d at 90.]

For a civil war on this subject matter, see *Daly v. General Motors Corp.,* 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 (1978). Our Supreme Court refused to adopt the concept of comparative negligence. *Syroid v. Albuquerque Gravel Products Co.,* 86 N.M. 235, 522 P.2d 570 (1974).

The failure of decedent to discover the absence of oil or to guard against its absence is one form of contributory negligence that is not a defense. The conduct of the decedent was not a defense in this case.

The only issue on this appeal is whether the airplane was in a "defective condition unreasonably dangerous."

### D. A leased airplane absent oil is in a defective condition unreasonably dangerous.

The trial court found that:

The defendant rented a defective product, an airplane without oil in the engine, which was unreasonably dangerous to the user, decedent.

Defendant "believes that a lack of oil in an airplane is not a defect of the type ordinarily included in strict tort liability." The absence of oil, it says, is a "condition." It is more than a mere "condition." The absence of oil in an airplane is a "defective condition unreasonably dangerous." In *First Nat. Bk., Albuquerque v. Nor-Am Agr. Prod., Inc.,* 88 N.M. 74, 85, 537 P.2d 682 (1975) we paraphrased the pertinent parts of Restatement of the Law, Torts 2d § 402A. In applying this language to the instant case under the lessor-lessee doctrine, it reads as follows:

A lessor of a product (1) in a defective condition, unreasonably dangerous (2) to the lessee, is subject to liability . . .

In strict liability tort law we do not speak primarily in terms of a "defect" in a product. A defect may be harmless. We speak in terms of a product in a "defective condition unreasonably dangerous" to the user.

What does "defective condition unreasonably dangerous" mean? Definitional concepts are set out in § 402A comments (g) and (i).

Comment (g) entitled "Defective condition" states:

The rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, *in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.* . . . [Emphasis added.]

Comment (i) entitled "Unreasonably dangerous" states:

. . . *The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it,* with the ordinary knowledge common to the community as to its characteristics. . . . [Emphasis added.]

These definitional concepts have spawned an avalanche of analysis, comment and criticism. The easiest way to resolve the interpretation of comments (g) and (i) is to use a tort way of thinking and tort terminology based upon the purposes of strict tort liability law. As a result, the courts now say that "defective" and "unreasonably dangerous" are synonymous. "Defective" means "unreasonably dangerous" and has no independent significance. The important factor to consider is whether the product has met the reasonable expectations of an ordinary user as to its safety. *Seattle-First National Bank v. Tabert,* 86 Wash.2d 145, 542 P.2d 774 (1975); *Casrell v. Altec Industries Inc.,* Ala., 335 So.2d 128 (1976); *Lamon v. McDonnell Douglas Corp.,* 19 Wash.App. 515, 576 P.2d 426 (1978).

*Seattle-First National Bank* (motor vehicle), followed in *Lamon* (airplane) stated the rule as follows:

If a product is unreasonably dangerous, it is necessarily defective. The plaintiff

may, but should not be required to prove defectiveness as a separate matter.

\* \* \* \* \* \*

Thus, we hold that liability is imposed under Section 402A if a product is not reasonably safe, . . . [542 P.2d at 779.]

*Casrell,* followed in *Lamon,* says:

Our answer is, a "defect" is that which renders a product "unreasonably dangerous," i. e., not fit for its intended purpose, and that all "defective" products are covered. Whether a product is "unreasonably dangerous" is for the trier of fact, just as negligence, vel non, is in a traditional negligence case.

The product either is or is not "unreasonably dangerous" to a person who should be expected to use or to be exposed to it. If it is, it makes no difference whether it is dangerous by design or defect. The important factor is whether it is safe or dangerous when the product is used as it was intended to be used.

. . .

\* \* \* \* \* \*

"Defective" is interpreted to mean that the product does not meet the reasonable expectations of an ordinary consumer as to its safety. . . . [335 So.2d at 133.]

"Whether concern is with one or both of the requirements, there is 'general' agreement that to prove liability under § 402A the plaintiff must show that the product was dangerous beyond the expectations of the ordinary [consumer]." *Bruce v. Martin-Marietta Corp.,* 544 F.2d 442, 447 (10th Cir. 1976).

In the instant case, decedent used the airplane in the way it was intended to be used. In its condition, the airplane was unreasonably dangerous and unsafe to decedent. When aloft, this condition challenged the safety of decedent for the purpose for which the airplane was to be used and was the proximate cause of his death. "The purpose of the 'unreasonably dangerous' clause would appear to be best served by its inclusion in the issue of proximate cause." *Berkebile, supra* [337 A.2d at 899].

Defendant's argument is that it had "no duty to make an 'obviously' dangerous product safe. Neither is an 'obviously dangerous product' defective in a legal sense." Unfortunately, the airplane was not "obviously" dangerous to decedent who was without awareness of the danger. It was "obviously" dangerous to defendant with knowledge. To avoid liability, defendant had a duty to remove the danger before leasing the airplane.

Airplane cases on this subject matter are sparse. *Lamon v. McDonald Douglas Corp., supra; Wilson v. Piper Aircraft Corp.,* 282 Or. 61, 577 P.2d 1322 (1978); *Berkebile v. Brantly Helicopter Corporation, supra; Kritser v. Beech Aircraft Corporation,* 479 F.2d 1089 (5th Cir. 1973), and *Bachner v. Pearson, supra.*

*Lamon* involved an airline stewardess who stepped into an *open* emergency hatch of a DC–10 airplane. Defendant contended that the defect was open and obvious precluding recovery. The court held that a *patent* danger did not relieve the defendant of liability automatically *unless the plaintiff voluntarily and unreasonably encountered the danger.*

In *Wilson,* plaintiff's theory was that the crash was caused by engine failure resulting from carburetor icing. Plaintiff contended that an airplane furnished with a standard airplane engine was defective because an engine of another type, or with a different carburetor system, would be safer in one particular. A judgment for plaintiffs was reversed for a new trial because no evidence was presented that an alternative safer design, practical under the circumstances, was available.

In *Berkebile,* while climbing in flight, the seven foot outboard section of one of the three main rotor blades of a helicopter separated. The helicopter crashed on a wooded hillside, killing the decedent operator. Defendant theorized that the rotor blade had fractured due to an abnormal use brought

about by power failure resulting from fuel exhaustion, followed by a failure on decedent's part to push down the collective pitch in time to go into autorotation and to effect a proper emergency landing. The rotor system was open and obvious. Plaintiff claimed that the design of the rotor system was defective because the average pilot had insufficient time to place the helicopter in autorotation in an emergency power failure in climbing flight. The court said:

> The autorotation system is a safety device existing for the sole purpose of preventing a crash in the event of engine failure *for any reason.* The reason the engine failed is irrelevant. Even defendant's argument that decedent was flying without gas, would be no "abnormal use." The autorotation system only comes into use in the event of engine failure for whatever reason it may be. Nor can it be said that the failure of decedent to go into autorotation "within the necessary time" rebuts the contention that the autorotation system was defective in not allowing sufficient time for its activation. . . . [Emphasis by Court.] [337 A.2d at 901.]

In *Berkebile,* the autorotation system was obvious to decedent as a safety device as the oil system was to decedent in the instant case. Both existed for the sole purpose of preventing a crash in the event of engine failure *for any reason.*

*Kritser* involved a relatively new airplane operated by decedent, a qualified pilot. As the airplane approached the runway with landing gear down, the right engine fluttered and backfired. Despite the pilot's efforts to regain altitude, the plane rose only slightly before spinning and falling toward the ground. Plaintiff focused on an alleged defect in the fuel system whereby there was an interruption or "parting" of the fuel supply to the engine when the plane engages in a maneuver known as a "slip." To accomplish a slip, the pilot lowers one wing and then applies the rudder in a direction opposite the lowered wing. The nose of the plane does not turn, but the plane slips sideways. Resulting forces displace the fuel away from the fuel outlet of the tank in the lowered wing. Then air instead of fuel flows from the tank to the engine, and the engine misfires and loses power. "Kritser had actual knowledge and notice of the flight manual supplement issued by Beech Aircraft stating:

> 'Flight operation "CAUTION" To prevent fuel flow interruption, avoid prolonged operation in a slip or skid attitude under low fuel conditions.' " [479 F.2d at 1094.]

The evidence established a "slip" of the plane during operation. This notice was not sufficient to absolve defendant of liability. The court said:

> According to comment j in the Restatement, a seller may be required to give a warning in order to prevent a product from being unreasonably dangerous. Then the product "is not in a defective condition" if the product "is safe for use" when the warning is followed. Beech Aircraft cannot simply give a general warning. The warning must be adequate *to make the airplane safe* when the warning is followed. Here the jury expressly found that Kritser followed the recommended procedures set out in the owner's manual . . . .. Thus, *the warning was inadequate to make the product safe.* [Emphasis added.] [479 F.2d at 1096.]

*Bachner,* cited in *Stang,* held a lessor liable when it leased an airplane with a hole in the exhaust system that allowed carbon monoxide to enter into the cabin causing the aircraft to crash. From the view of safety to the pilot, there is no difference between a hole in an exhaust system and a hole in the oil system. The absence of oil in an engine equates with a leak in the oil system that empties the oil during flight. Both are "unreasonably dangerous," a risk that the lessor cannot impose on the lessee.

788

In strict tort liability our perspective should be broad, not limited.

To absolve the defendant of liability is to encourage the lease of airplanes without oil in them. In manufacturer's design cases, courts no longer subscribe to the "patent-latent" distinction in the conduct of a manufacturer's strict liability in tort. Its only function is to encourage patent design defects. *Byrns v. Riddell, Incorporated,* 113 Ariz. 264, 550 P.2d 1065 (1976); *Brown v. North Am. Mfg. Co.,* 576 P.2d 711 (Mont. 1978).

We must not forget the policy of the law stated by Chief Justice Vanderbilt in *Stang*:

"'* * * One of the great virtues of the common law is its dynamic nature that makes it adaptable to the requirements of society at the time of its application in court'." [83 N.M. at 735, 497 P.2d at 737.]

Today, we must say that a leased airplane absent oil is unsafe to decedent. It was in a "defective condition unreasonably dangerous."

The judgment of the trial court should be affirmed.

E.   *Plaintiff's conduct is not a mitigating factor in strict liability in tort.*

Defendant suggests the adoption of comparative negligence law. This we cannot do.

This case should be affirmed.

"APPENDIX A"

STATE OF NEW MEXICO

IN THE DISTRICT COURT

BARBARA J. RUDISAILE, Personal
Representative, Surviving Spouse
and Executrix of the Estate of
STANLEY E. RUDISAILE, Deceased,

     Plaintiff,

  vs.

HAWK AVIATION, INC., a New
Mexico corporation,

     Defendant.

No. 74–822

OPINION

The issues presented in this case are: (1) Causation, (2) Strict Liability (3) Affirmative Defenses (4) Damages.

*Causation* : The issue here is whether the cause of the crash was lack of oil, lack of gasoline or both. The evidence is indisputable that prior to leasing the airplane to the decedent the oil had been drained from the engine and not replaced. An entry of the oil change had been made in the log book and the log book was handed to the decedent just prior to take off. The decedent did not check the oil level before take off. The engine ran without oil about six minutes from the time of taxi to take off, plus

the time from take off to time of crash. After the crash there was damage to the internal parts of the engine from having run without oil, including signs of overheating. Witness Hines' explanation of what happened when the engine overheated causing the valves to stick resulting in loss of power was logical, reasonable and persuasive. The testimony of the witnesses concerning the sounds the plane was making just before the crash is compatible with Hines' explanation of what was happening to the engine. The evidence shows that the engine had not completely failed at the time of the crash but was only developing about 500 RPM or idle speed although the throttle and mixture controls were set at three quarters full. That was not enough power to maintain level flight. All of the witnesses who testified on the matter agreed that the engine would have been running rough, noisy and some vibration from the lack of oil. The preponderance of the evidence proves that the cause of the crash was loss of power resulting from the engine malfunctioning from lack of oil. After the crash the fuel selector was in the left tank position. The fuel quantity indicator showed one quarter full in the left tank and between three quarters and full in the right tank. On a visual and stick-in-tank check made by Barnes he found no gas in the left tank. The electrical boost pump was on and in operating condition. After the crash the fuel system was found intact except the fuel strainer bowl had been broken off. When the fuel selector was switched to the right tank with the boost pump on, fuel was pumped out at the fuel strainer break. After the crash the plane ended in a position listing about fifteen degrees to the right with tail down. If gasoline had been pumped from the left tank after the crash the natural tendency would have been for it to flow towards the right wing from the break at the fuel strainer. When the right tank was checked by removing the cap, fuel ran out and was evident on the ground. The tanks on the plane each held 25 gallons of fuel. Only 24 gallons were actually usable. On the morning before the fatal flight Allen Hawkinson had flown the plane 2.9 hours. The engine consumed fuel at the rate of 8.4 gallons per hour. He indicated he had done all of the flying from the left tank. Simple mathematics shows that 24.36 gallons would have been consumed from the left tank. More than the usable amount. This is assuming the tanks had been filled to capacity. There was a conflict in the evidence in that regard. The tanks may have been filled only to the tabs making each tank hold only 18 gallons. If that were the case Allen Hawkinson's testimony is even more improbable. The decedent either took off on the right tank or the left tank. We know he ended up on the left tank. If the decedent took off on the right tank, there would have been no need to switch to the left tank unless the engine did start running rough. The evidence was that the normal procedure to follow when the engine starts running rough, missing and the like, is to turn on the boost pump, switch tanks and try to locate the trouble. Assuming there was very little or no gas in the left tank the proximate cause of his being in that position was from the lack of oil in the engine. But for the engine running rough or missing from lack of oil, there was no need to switch tanks. Again assuming he took off on the right tank and there was no engine trouble, in that case we would have the situation that for some unexplained reason he switched to the left tank, ran out of gas and crashed without switching back to the right tank. Such an assumption is not reasonable nor probable under the facts of this case.

If the decedent took off on the left tank we would have to conclude that when the engine started missing either from lack of fuel or from lack of oil or both that he did not switch tanks. The standard procedure is to take off and land on a full or the fullest tank. The decedent was a properly certified commercial pilot with an instructor's rating. An instructor pilot normally flies from the right seat as did the decedent at the time of the crash. Allen Hawkinson who had flown the plane many hours testified he had switched tanks from the right seat many times with no trouble.

Based on all the facts and the reasonable inferences from those facts, the proximate cause of the crash and death of decedent was lack of oil in the engine and in any event was at least a contributing proximate cause.

Plaintiff also claims a right to recover on the basis of a misrepresentation by defendant. New Mexico has not adopted the rule of strict liability as set out in Restatement of Torts (2nd) Sec. 402B. However, even if 402B were the rule in New Mexico the evidence does not clearly demonstrate that the decedent relied on the misrepresentation contained in the log book and spoken by Mr. Hawkinson. Did he simply forget to check the oil or did he rely on the misrepresentation? There is no direct evidence on the point. It would have to be by inference. The burden of proof has not been met on that point.

*Strict Liability* : On legal principles there is no valid distinction between this case and *Stang v. Hertz*, 83 N.M. 730, 497 P.2d 732 wherein the rule of strict liability was applied to leased vehicles.

Here the defendant rented a defective product, an airplane without oil in the engine, which was unreasonably dangerous to the user, decedent, and which caused the death of the decedent. The defendant, lessor, was engaged in the business of renting airplanes and the airplane was expected to and did reach the decedent without substantial change in its condition after it was rented.

These conditions meet the test of strict liability. Restatement of Torts (2nd) Sec. 402A as extended to lessors.

Defendant claims that this is a case of personal services involving an oil change and that strict liability does not apply to personal services. The fallacy of that argument is, 1. the personal services were not rendered to the decedent but to the defendant; 2. the cause of the defective condition while under the control of the defendant is immaterial as far as the duty owed the decedent is concerned.

Defendant claims that the public policy reason for strict liability is to protect the ordinary consumer and that the decedent was a certified flight instructor not an ordinary consumer, ergo strict liability does not apply. The protection afforded by the rule of strict liability applies equally to the wary and unwary. The well qualified pilot is no more fair game than the ordinary pilot.

*Affirmative Defenses* : It is agreed that ordinary contributory negligence is not a defense in a case of strict liability.

Defendant claims that the defect was obvious and therefore not unreasonably dangerous. He bases this on the fact that decedent did not check the oil level before take off and that the oil pressure and oil temperature gauges were in proper working order which would have alerted the pilot to the defective condition. This is simply a way of saying that decedent negligently failed to discover the defect, ordinary contributory negligence, which is not a defense.

Defendant also claims that decedent misused the airplane by not ascertaining its safety as required by F.A.A. regulations. He confuses the word misuse. Misuse contemplates an abnormal or unexpected use of the product. It presupposes that the product was delivered in a safe condition but by the abnormal or unexpected use the dangerous condition was created. The facts of this case will not support such a contention. There are no facts nor reasonable inferences which would show that decedent discovered the lack of oil in the engine and was aware of the danger and nevertheless proceeded unreasonably to fly the plane. See *Bendorf v. Volkswagenwerk*, 88 N.M. 355, 540 P.2d 835, citing comment (n) to Sec. 402(A) Restatement of Torts (2nd) for distinction of discovered and discoverable defect.

*Damages* : At the time of his death Dr. Rudisaile was 37 years of age with a life expectancy of 34.88 years. He was a dentist with at least an average income of $25,273.00 per year for the last four years of his life. Based on the guidelines of the Varney and subsequent cases $235,000.00 is a reasonable amount for damages.

Counsel will submit any requested findings of fact and conclusions of law by April 25, 1977. Counsel for plaintiff will submit a form of judgment in accordance with this opinion.

/s/ JAMES W. MUSGROVE
District Judge