**In the Matter of the Application of Thomas S. OBERMEYER.**

**No. S–950.**

Supreme Court of Alaska.

April 18, 1986.

Thomas S. Obermeyer, pro se.

Stephen J. Van Goor, Anchorage, for Alaska Bar Assn.

Before RABINOWITZ, C.J., and BURKE MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

In this case the court is faced with a challenge to the Alaska Bar Association's (ABA) administration and grading of the Alaska Bar Exam (Exam). Thomas S. Obermeyer (Obermeyer) appeals from the denial of a hearing by the ABA's Board of Governors (Board). He also challenges, on equal protection and due process grounds, various grading and scoring practices, as well as the ABA's policy of refusing to return the questions and answers to the Multistate Bar Examination (MBE). We affirm in part and remand in part.

## I. FACTS AND PROCEEDINGS

Obermeyer took and failed the July 1984 Exam. He appealed the denial of certification to the Board of the ABA, and requested a regrade of his exam and a hearing before the Board pursuant to Bar Rule 6, Section 2. Obermeyer made numerous allegations, hereinafter discussed. The Board determined that Obermeyer had failed to allege facts which, if true, would establish an abuse of discretion or improper conduct by the ABA, and denied him a hearing. This appeal followed.

## II. DESCRIPTION OF THE ALASKA BAR EXAM

In order to understand Obermeyer's allegations, familiarity with some of the procedures used in administering and grading the exam is required. We will present only the highlights here, and note additional details where necessary to our analysis.

The exam is a 2½ day exam. One full day is devoted to the nationally administered MBE. The rest of the exam consists of essay questions. Three hour-long essays are weighted at 30% of the total essay score, six half-hour questions account for 45%, and a research/analysis practicum accounts for the remaining 25%. The total essay score is given 50% weight, and the MBE receives the other 50%.

To grade the essay portion of the exam, graders first meet to calibrate a particular essay question. At least five graders read and individually score five randomly selected answers on a scale of one to five. They repeat this process several times, with each grader reading at least twenty exams, until the graders agree on a set of answers that are representative of each of the five possible levels. These "benchmark" answers are then used as guides in assigning scores to the remaining papers. Two graders read each essay and score it. If the scores they assigned differ by more than one point, the two graders refer to the benchmarks and resolve their differences. If the scores are within one point, they are simply averaged.

The scores are then weighted, combined and converted to the same unit of measurement as the MBE score, so that the essay and MBE scores can be combined for the purpose of making pass/fail decisions. Exams within one point of passing are reread and, if necessary, recalculated before the scores are announced.

Failing applicants are notified in accordance with Alaska Bar Rule 4(4), and are offered the opportunity to inspect their essay examination booklets and grades, as well as a representative sampling of answers from other applicants.

### III. ISSUES ON APPEAL

There are two main issues on appeal here, with several sub-issues that relate to both of the larger categories. The first question is whether the ABA violated Obermeyer's right to procedural due process when it denied him a hearing on his allegations of procedural improprieties and substantive deficiencies. The second is whether the ABA violated Obermeyer's substantive due process and equal protection rights in administering and grading the exam.

Obermeyer makes substantially the same allegations and arguments in his brief to this court as he made in his Request for Hearing to the ABA, by which the sufficiency of his allegations must be judged on the appeal from denial of a hearing. To avoid repetition, we will set forth the analytical framework for both of the major issues, then discuss Obermeyer's specific allegations with reference to both issues simultaneously.

### A. DID OBERMEYER MAKE SUFFICIENT FACTUAL ALLEGATIONS WHICH, IF TRUE, WOULD ESTABLISH ABUSE OF DISCRETION OR IMPROPER CONDUCT ON THE PART OF THE ABA IN ORDER TO BE GRANTED A HEARING UNDER ALASKA BAR RULE 6(2)?

■ Alaska Bar Rule 6(2) provides that an unsuccessful applicant for certification may appeal to the Board. If the appli-cant alleges facts which, if true, would establish an abuse of discretion or improper conduct on the part of the Board, the Executive Director of the Law Examiners Committee or the ABA, he is entitled to a hearing. A hearing is required in response to sufficient allegations of either procedural improprieties or substantive deficiencies. *Application of McKay*, 706 P.2d 684, 686 (Alaska 1985). Conclusory statements which fail to allege specific factual inadequacies with either the grading system or its application to the appellant's exam are insufficient. *Id.*

### B. DID THE ABA VIOLATE OBERMEYER'S RIGHTS TO EQUAL PROTECTION AND DUE PROCESS IN THE ADMINISTRATION AND GRADING OF THE ALASKA BAR EXAMINATION?

Obermeyer's substantive due process and equal protection argument is quite ambiguous. It hinges on his claim that the pursuit of a legal career is a fundamental interest, and that the Bar's administration and grading procedures require justification by a compelling state interest. He cites *Sheley v. Alaska Bar Association*, 620 P.2d 640 (Alaska 1980) for this proposition. *Sheley*, however, involved the privileges and immunities clause, which is not applicable here since Obermeyer is a resident of Alaska. This court has not held that the right to practice law is fundamental for purposes of either due process or equal protection analysis.

■ Under the equal protection analysis, the question is whether the Board's examination procedures bear a fair and substantial relation to the purpose of assuring minimal competence of lawyers when the means used and the reasons advanced therefore are closely scrutinized. *Application of Butterfield*, 581 P.2d 1109, 1110 (Alaska 1978).

■ In order to establish a due process violation, Obermeyer must establish that the challenged procedures are so irrational or arbitrary, or so lacking in fairness, as to

shock the universal sense of justice. *Bachner v. Pearson*, 479 P.2d 319, 334 (Alaska 1970).

A discussion of Obermeyer's specific allegations under both the equal protection and due process frameworks, and in light of the requirements to be granted a hearing, follows.

### 1. Grading Standards.

Obermeyer argues that the grading standards used by the ABA's examiners are arbitrary, nonreliable, nonquantifiable and nonscientific, and thus violated his substantive due process and equal protection rights.

■ He first complains of the use of "representative answers" called "benchmark" answers by the ABA instead of the grader's guide in assigning scores, but does not discuss how the current system is a violation of due process. The ABA's explanation of how the benchmarks are established and of the calibration process is reasonable. These procedures are within the discretion of the ABA.

■ Obermeyer also contends that he should have been given extra credit when he discussed criminal law issues on a torts question. A comparison of his answer and the grader's guide shows that he missed several of the torts issues while spending considerable time discussing criminal law. We do not believe the ABA's policy of not giving extra credit for such digressions is an abuse of discretion.

■ Obermeyer argues that the benchmark papers made available to failing applicants are not the "representative sampling of passing and failing answers" which are subject to production pursuant to Bar Rule 6(7a).[1] He notes that the benchmark scores mean nothing because the applicant cannot determine whether he passed or failed by looking at the scores alone. The question of whether an applicant passed or failed is based on the overall score he received, and is not determined on the basis of each individual question.

■ In *Application of Peterson*, 459 P.2d 703 (Alaska 1969), we held that, in order to insure an intelligent review by the board, a failing applicant should have access to "a representative sampling of the examination papers of other applicants who received *overall passing and overall failing grades.*" *Id.* at 709 (emphasis added, footnote omitted). By releasing only the benchmark answers for each individual question the ABA has failed to comply with our mandate in *Peterson*. Under the specific language in both Bar Rule 6(7a) and in *Peterson*, Obermeyer was indeed entitled to a sampling of overall passing and failing exams, not merely benchmark answers.[2]

### 2. Weight and Correlation of Essay Scores.

■ Obermeyer argues that the ABA abused its discretion when it "employed a computer to weight essay scores, to replace essay scores with artificially contrived MBE scores, and to average the resulting artificial essay scores with raw MBE scores." His main contention is that the statistical correlation of the essay scores to the MBE scores is invalid since fewer people were required to take the MBE than took the essay portion of the exam. His

---

1. Alaska Bar Rule 6(7a) provides:

   Section 7. Only the following materials shall be subject to production by the Alaska Bar Association in any proceedings held pursuant to this Rule:

   (a) Where certification for admission to practice has been denied, the failing applicant has the right to inspect his examination books, the grades assigned thereto, the examination questions, the graders' analyses of the questions and *a representative sampling of passing and failing answers* to the bar examination at the office of the Alaska Bar Associa-

   tion or at such other places and such time or times as the Board designate;
   (Emphasis added).

2. This ruling does not require us to overturn the ABA's decision not to grant Obermeyer a hearing. He is still required to meet the standard set forth in *McKay*, 706 P.2d at 686, by sufficiently alleging either procedural improprieties or substantive deficiencies which, if true, would establish an abuse of discretion or improper conduct on the part of the ABA.

analysis goes no further than this, however. He does not explain under what theory these calculations are invalid, nor does he discuss how this type of scoring had a negative impact on his, or anyone else's, score.[3]

Obermeyer goes on to question why the correlation should be done at all, given Alaska's small test population. He does not elaborate how this practice constitutes an abuse of discretion.

He also criticizes the weights given to each portion of the essay exam in calculating the overall score, since "the applicant is applying the same cognitive and analytical power for the same period of time in each of the three sessions."

According to the ABA, the weights are a reflection of the importance attached to the skills required for each type of question. The long essays test depth of knowledge, the shorter ones test ability to spot issues, and the research problem tests ability to separate relevant from irrelevant facts and law. The ABA's judgment on the relative importance of these skills is certainly as good as Obermeyer's. The weights given each section are reasonable and within the ABA's discretion. Again, no hearing is required.

### 3. Reread Policy.

■ Obermeyer challenges the ABA's policy of rereading papers only if the scores are between 139.00 and 139.99 (140 is the lowest passing score). He argues that this cut-off is arbitrary, and is thus a denial of due process. The thrust of his argument is that the statistical variance between 139.00 and 139.99 is only 0.7%, which is considerably smaller than the margin of error permitted by averaging scores assigned by different graders when they differ by only one point. For example, if one grader assigned an exam answer a score of 2, while another gave that exam a 1, the final score for that question would be 1.5. This is a variance of at least 25% from either of the scores actually assigned by the graders. There may be facial validity in this argument. It certainly seems that the Bar should be willing to allow a reread for at least as large a variance as the margin of error its examiners are allowed in averaging scores.

Obermeyer's statistical analysis, however, is an apples to oranges comparison, which is not particularly fruitful. The appropriate comparison would be of the variance created by averaging as a function of the *total* exam score to the variance allowed by the reread policy. There may indeed be a 25% variance in original points given for a particular answer. But that score is then combined with other answers and weighted according to which portion of the test it fell under, converted to an MBE scaled score, added to the actual MBE score, and divided by two. The resulting statistical variance is obviously far less than 25%. Obermeyer offers no analysis on this point.

In any event, Obermeyer scored 116 on the July 1984 exam, or 24 points away from passing. He makes no argument that he would have gained sufficient benefit from a reread to put him in the passing range.

Obermeyer's presentation is insufficient to demonstrate that the ABA violated his equal protection or due process rights or that it abused its discretion in administering the reread policy.

### 4. Use of Local Attorneys as Proctors and Examiners.

■ Obermeyer objects to the use of Anchorage attorneys as proctors and examiners, especially when a proctor and an examiner are both employed by the same Anchorage firm. He claims that this is a conflict of interest, that it is not necessary, and therefore is an abuse of discretion and a violation of due process.

Obermeyer cites one proctor who works at a firm which also employs an examiner. Obermeyer's wife is currently engaged in litigation against one of the partners in

---

**3.** We note that the ABA has changed its rules and now requires all applicants to take both the essay and MBE portions of the test. *See* Alaska Bar Rule 2.

that firm. He further mentions an examiner who represents a credit union whose election procedures Obermeyer recently challenged. He specifically avoids accusing any of these lawyers of engaging in improper conduct, but claims that there is a potential for breach of security of the applicant's identity.

Since he lacks the slightest evidence of actual wrongdoing to support his position, Obermeyer's argument on this issue cannot stand.[4]

The ABA points out that the proctors may see the applicant number during the exam, but they have no way of alerting the graders to the identity of an applicant because that number is removed and replaced by a different code number which is used throughout the grading process, and to which the proctors have no access.

■ A breach of security such as the one Obermeyer hypothesizes seems to be only a remote possibility. The use of local attorneys is not in and of itself an abuse of discretion. In the absence of any specific allegations of improper conduct, the Board was justified under *McKay* in denying Obermeyer a hearing on this issue.

5. Security and Confidentiality.

Obermeyer presents a laundry list of complaints about breaches of security and confidentiality in the examination procedures, none of which have any merit.

■ Several of his complaints concern the February 1984 exam, which is not the subject of this appeal. The arrival of his applicant number and scores in unsealed envelopes, as well as his concern with the practice of unsealing the MBE booklets to mix them up (in order to prevent copying by examinees seated at the same table), all involve the February 1984 exam.

■ He claims that a typewritten response, which was single-spaced in violation of the rules, could have served as a "flag" to a friendly examiner. He offers no argument that this actually happened or that his score was negatively affected by this incident.

Obermeyer next offers several anecdotal examples which he believes illustrate poor selection and lack of training of the examiners, as well as dictatorial control of the exam by the ABA. These arguments are frivolous and do not warrant discussion.

■ Obermeyer further hypothesizes security breaches in the handling of the MBE. He objects to the reporting of MBE scores to the Examination Committee for the computation of final scores without mailing MBE results directly to the applicant's home. He does not explain why direct mail is preferable to the current system whereby the MBE score is reported along with the essay score on the applicant's score sheet. The applicant may obtain a regrade of the MBE to verify results, which Obermeyer did. However, Obermeyer claims that the regrade is inadequate because he has no way of being certain that a proctor didn't simply erase some of the pencilled dots on the score sheet before sending it to be graded.

The various strands of Obermeyer's conjecture on this subject in no way merge into a demonstration of due process or equal protection violations, nor are they sufficiently specific to warrant a hearing.

■ Furthermore, Obermeyer criticizes the "appalling lack of supervision over examiners." He objects to the exams being taken from the ABA's office to the graders' homes for grading, and suggests that we check the security procedures used in other states.[5]

---

**4.** The Code of Conduct for the Law Examiners Committee provides in part:

No member of the Committee shall participate in any phase of the grading process once that member has determined that he or she is able to recognize the identity of an examinee from an answer to any question or questions or in any other manner. 2 ABA 02.070(3)

**5.** We point out that Obermeyer has the burden of persuasion on this appeal. If information about security procedures used in other states would have supported his position before this

Obermeyer is also concerned that "[s]ince examiners are allowed to grade papers in their spare time, presumably when they are alert and sober, there is no guarantee the papers are read at all." As evidence of this possibility, he cites the fact that no marks are made on the exam papers. The reason there are no marks on the paper is that two graders independently grade each exam. Marks placed on an exam by the first grader might affect the second reader's assessment of the exam. Obermeyer's skepticism about whether the exams were even read has no factual basis. His suggestion that each examiner receive a photocopy of the exam does not amount to a demonstration of abuse of discretion.

Obermeyer's final objection in this category is to the length of time it takes to grade the exams and return the scores. He makes no argument that this is an abuse of discretion or that it affected his score in any way.

None of the allegations made in this section demonstrate any violation of due process or equal protection, nor are they sufficiently specific to warrant a hearing under the requirements of *McKay.*

### 6. Lack of Opportunity to Examine MBE Questions and Answers.

Obermeyer argues that the ABA's policy of refusing to return questions and answers to the MBE is a violation of due process.

Alaska Bar Rule 6(7a) provides for release of examination materials, answers, grader's guides and a representative sampling of passing and failing answers to failing applicants. Bar Rule 4(5) prohibits access to MBE materials if the material is unavailable under the rules or policies of the National Conference of Bar Examiners (NCBE). The NCBE's "strong policy" is to prohibit inspection of the MBE unless required by a statute or court rule. The rationale for this policy is that some questions are reused in subsequent tests in order to statistically standardize the diffi-

court, he should have presented that informa-

culty of the MBE from year to year. Despite NCBE policy, we believe Obermeyer should have been granted an opportunity to review the MBE questions and answers.

In *Application of Peterson,* 459 P.2d 703 (Alaska 1969), we held that the ABA's policy of denying a failing applicant access to essay questions and answers on the bar exam amounted to denial of a fair hearing. *Id.* at 709. We are convinced that this rationale also applies to the multiple-choice MBE.

Absent a blanket prohibition by the NCBE, the policies upon which Bar Rule 4(5) rests should be balanced to accommodate a failing applicant's interests both in learning why he failed the exam and in discovering any errors in grading or scoring. By inspecting the MBE, a failing applicant may identify problem areas and avoid wasting time and money by directing his energies in the appropriate direction for the next exam. An applicant may satisfy himself that the questions are fairly drafted and the answers are correct. He may also check to insure that his exam was correctly marked.

As in *Peterson,* we are not basing our decision on any constitutional due process claims. We are instead acting "under our inherent powers governing admission to the practice of law and our general supervisory powers pertaining to admissions procedures." *Id.*

We believe simply that to fail a bar applicant and to deny him entry to his chosen profession, while keeping the exam on which the denial is based cloaked in absolute secrecy, offends a sense of fairness. *See Taylor v. Safly,* 276 Ark. 541, 637 S.W.2d 578, 580 (1982). We therefore interpret Bar Rule 4(5) to allow a failing applicant access to MBE questions and answers and to the applicant's own answers.

We are aware that difficulties may arise in formulating and implementing workable policies providing for access to the MBE. However, we are confident that the ABA and NCBE can develop an acceptable ac-

tion.

commodation. The NCBE already allows inspection of the MBE in states where a statute or court rule requires access. We note that access to the MBE is granted in California, which has several thousand failing applicants each year. The fact that workable inspection policies have been developed in other states, apparently without affecting the validity of the MBE, convinces us at this time that a rule favoring fairness to the failing applicant should replace a policy designed for the convenience of those who administer the test.

### 7. Inherent Reliability of the Essay Test.

 Obermeyer contends that the essay portion of the exam is inherently unreliable, invalid and unjustifiable and is thus a violation of due process and equal protection rights. His allegations are supported by articles discussing the reliability of bar exams in general.

Obermeyer's most tenable argument addresses the question of scoring consistency. He cites a study which showed inconsistencies between different graders and between the same grader at different times. We believe the ABA's elaborate process of establishing consensus on benchmark answers, its requirement that two graders grade each exam and agree within one point on the appropriate score, and its reread policy for papers that come within one point of passing sufficiently establish the fairness of exam grading procedures. *See Hooban v. Board of Governors of Washington Bar Association,* 85 Wash.2d 774, 539 P.2d 686 (1975), *appeal dismissed,* 424 U.S. 902, 96 S.Ct. 1092, 47 L.Ed.2d 306 (1976) (mem.).

We decline to hold that essay exams generally are an unacceptable way to evaluate applicants for admittance to the Bar, and we do not believe Obermeyer has demonstrated violations of equal protection or due process.

### V. CONCLUSION

Obermeyer's arguments. are basically very vague and conclusory. His briefs con-

tain almost no legal analysis, nor any substantiated factual allegations. His complaints of security breaches and mishandling of exams are entirely speculative and do not warrant a hearing. With the exception of his argument that he is entitled to a representative sampling of overall passing and failing exams and to an opportunity to review MBE questions and answers, Obermeyer's criticisms of the administration of the exam amount to no more than disputes with the ABA about the ideal way to handle the Bar exam. They do not establish violations of equal protection or due process rights.

AFFIRMED in part and REMANDED in part for action consistent with this opinion.